PRAXAIR, INC. v. AIRGAS, INC., 1999 NCBC 5

| STATE OF NORTH CAROLINA | ) | IN THE GENERAL COURT OF JUSTICE |
| MECKLENBURG COUNTY | ) | SUPERIOR COURT DIVISION |
| | | 98 CVS 8571 |
| PRAXAIR, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORDER AND OPINION** |
| AIRGAS, INC., NATIONAL | ) | |
| WELDERS SUPPLY COMPANY, | ) | |
| INC., J.A. TURNER, JR., JUDITH | ) | |
| CARPENTER, and ERROL SULT, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

{1} This matter is before the Court on the motion for judgment on the pleadings of Defendant Airgas, Inc. (hereinafter "Airgas") pursuant to Rule 12(c) of the North Carolina Rules of Civil Procedure and the motion to dismiss pursuant to Rule 12 (b)(6) of the Defendants National Welders Supply Company, Inc. (hereinafter "National Welders"), J.A. Turner, Jr., Judith Carpenter, and Errol Sult (hereinafter collectively the "Individual Defendants"). For the reasons and subject to the qualifications set forth below, the motions are denied in part and granted in part.

> *Womble Carlyle Sandridge & Rice, PLLC, by William C. Raper, Debbie W. Harden and Carol W. Exum; Sidley & Austin, by Nathan P. Eimer, Faith E. Gay and Lisa S. Meyer, for Plaintiff Praxair, Inc.*
>
> *Robinson, Bradshaw & Hinson, P.A., by John R. Wester, Mark W. Merritt, and Julian H. Wright, Jr.; Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, L.L.C., by Broox G. Holmes and Edward A. Dean, for Defendant Airgas, Inc.*
>
> *James, McElroy & Diehl, P.A., by Edward T. Hinson, Jr., Richard B. Fennell, Ann L. Lester and Jennifer A. Youngs, for Defendants National Welders Supply Company, Inc., J.A. Turner, Jr., Judith Carpenter and Errol Sult.*

## I. Factual Background

{2} In March, 1991, National Welders and J. A. Turner, Jr., Judith Carpenter, J. A. Turner III and Linerieux B. Turner (hereinafter the "Turner Family") entered into a contractual arrangement with Union Carbide Industrial Gases, Inc. (hereinafter "UCIG") which involved the purchase of certain assets from UCIG by National Welders. The Turner Family owned controlling interest in National Welders. As a part of that contractual arrangement the parties entered into a Right of First Refusal Agreement dated March 25, 1991 (hereinafter the "RFR"). The RFR provided that if the Turner Family desired to sell its shares in National Welders before March 2006, UCIG would, under certain circumstances, have a right of first refusal for the shares under the best terms offered to the Turner Family by another purchaser. Plaintiff, Praxair, Inc. (hereinafter "Praxair"), is the successor in interest to UCIG and seeks to recover damages based upon an alleged breach of the RFR by National Welders and the Turner Family.

{3} The portions of the RFR at issue provide:

> 3. (a) Until the fifteenth anniversary of the date hereof, (x) NW shall not transfer (by merger, reorganization, consolidation, exchange of securities, sale, or otherwise) substantially all of

the assets of any Subsidiary, division or branch of NW which, when aggregated with any other Subsidiary, division or branch transferred by NW within the immediately preceding one year period, generated more than ten percent (10%) of the gross revenue of NW during the fiscal year immediately preceding the proposed transfer as shown on the financial statements (and/or working papers relating thereto) of NW prepared as at the end of the fiscal year by the accountants of NW; (y) no Shareholder shall transfer (by gift, sale or otherwise) Shares or options to acquire Shares to any person not a party to this Agreement if the transfer would directly result in a Change in Control (as defined below); and (z) NW shall not sell or issue, or grant any option or other right to acquire or otherwise receive, any Shares to any Person not a party to this Agreement if the sale, issuance or option (upon exercise thereof) would directly result in a Change in Control; unless prior to each such occasion, referred to in any of the preceding clauses (x), (y) and (z), each Person considering such transfer (hereinafter collectively the "Seller") shall have given UCIG prior written notice of the proposed transaction, which notice will (i) set forth the price and all the material terms and conditions of such proposed transaction (including without limitation any collateral agreements by a party to this Agreement or any Affiliate of any such party, such as agreements for the sale and/or lease of property owned by others and used by NW, covenants not to compete, etc.) and identify the proposed transferee (the "Prospective Purchaser"); (ii) constitute an offer on behalf of the Seller (and each of them) to sell to UCIG such shares or other assets and to enter into such collateral agreements, all upon the same terms and conditions as are offered to the Prospective Purchaser for the same considerations and upon the same terms and conditions as are offered by the Prospective Purchaser (net of certain brokerage, sales consultancy, finders and other similar fees and expenses as provided below); provided, however, that if the consideration payable by the Prospective Purchaser includes consideration other than cash and UCIG is unable to provide the non-cash portion of the consideration, UCIG shall also pay to the Seller, in lieu of the non-cash consideration that UCIG is unable to provide, an amount which is the Economic Equivalent (as defined below) of such non-cash consideration proposed to be paid by the Prospective Purchaser; (iii) contain a true and complete copy of the bona fide offer by the Prospective Purchaser; and (iv) disclose the terms of each brokerage, sales consultant, finders and other similar arrangements applicable to the proposed transfer (or any portion thereof). (An offer made by the Prospective Purchaser to the Seller which is subject to UCIG's right of first refusal under this Article 3 as modified by any changes resulting from the application of the Economic Equivalent provisions stated above and as may be increased by an Increased Offer and which is submitted by the Seller to UCIG pursuant to paragraph (b) below is herein referred to as an "Offer"). The Offer will be deemed made to UCIG by the Seller only if the Seller elects to deliver notice of the Offer to UCIG in accordance with this paragraph (a).

(d) For purposes of this Agreement, "Change in Control" means any stock sale or transfer, merger, consolidation, reorganization, stock issuance, stock redemption or other transaction or occurrence or series of transactions or occurrences resulting in a change of ownership of the voting capital stock of NW or any of its successor corporations such that more than fifty percent (50%) of the voting rights, either on Shares outstanding or on a Fully Diluted Basis, of the voting capital stock of NW or any of its successor corporations is held, after such change, by Persons other than UCIG, the shareholders and members of the Immediate Family (as defined in paragraph 15(d)) of the Shareholders who are legally bound by this Agreement pursuant to or in accordance with Article 4; provided, however, that in calculating such more than fifty percent (50%) ownership test, Shares held by members of the Immediate Family of the Shareholders that are not subject to this Agreement (see Article 4 below) shall be deemed not to be owned by members of the Immediate Family of the Shareholders. For purposes of this Agreement, "Fully Diluted Basis" means after giving effect to the exercise of any and all options, warrants and securities which are convertible into or exchangeable for Shares.

{4} In its complaint, Praxair contends that in 1996 National Welders and the Turner Family violated

Praxair's rights under paragraph 3 of the RFR by constructing a "sham transaction" with Airgas. (Compl. Para. 1, Nature of the Action.) The alleged "sham transaction" involves an agreement between National Welders, the Turner Family and Airgas dated June 1996 (hereinafter the "Joint Venture Agreement"), pursuant to which Airgas acquired 47% of the voting capital stock of National Welders. Praxair alleges that this "sham transaction" is the basis for: (1) a breach of contract claim against National Welders and the Turner Family, (2) a claim for tortious interference with contract against Airgas, (3) a claim for tortious interference with economic advantage against Airgas, (4) an unfair trade practice claim against National Welders, Airgas and the Individual Defendants, and (5) a claim for civil conspiracy against all defendants. All of Praxair's claims are predicated on the premise that there has been a violation or breach of Praxair's rights under the RFR. If there has been no such violation or breach, all the claims would be meritless.

## II. Applicable Legal Standards

{5} The standard for testing the sufficiency of a complaint under Rule 12(b)(6) and Rule 12(c) is the same. All well-pleaded facts in the complaint must be accepted as true and the plaintiff is entitled to all permissible inferences to be drawn from those facts. The motions should be denied unless it is clear that plaintiff is not entitled to any relief under any statement of the facts. *Arroyo v. Scottie's Professional Window Cleaning, Inc.*, 120 N.C. App. 154, 461 S.E.2d 13 (1995) and *Hedrick v. Rains,* 121 N.C. App. 466, 466 S.E.2d 281 (1996). Judgment should be entered on such motions only when it is clear that there are no disputed facts and defendant is entitled to judgment as a matter of law. However, where the Court can construe the plain and unambiguous language of a contract to determine if it has been breached, judgment on the pleadings may be appropriate. *DeTorre v. Shell Oil Co.*, 84 N.C. App. 501, 353 S.E.2d 269 (1987).

{6} In ruling on the pending motions, the Court has reviewed and considered the Joint Venture Agreement even though that document was not attached to the complaint. The Joint Venture Agreement was referenced throughout the complaint and plaintiff argued to the Court that particular provisions of the Joint Venture Agreement established a violation of the RFR. (*See, e.g.,* Plaintiff Brief, pages 16-17.) At the heart of plaintiff's complaint is the allegation that the Joint Venture Agreement was a sham transaction. In ruling on a Rule 12(c) or Rule 12(b)(6) motion the Court should consider documents clearly referenced in and relied upon by the plaintiff in its complaint. *See Robertson v. Boyd,* 88 N.C. App. 437, 363 S.E.2d 672 (1988). In reviewing the RFR and the Joint Venture Agreement, the Court has also applied a rule of construction that restrictions on the alienation or transfer of stock are disfavored and should be strictly construed. *See Bryan-Barber Realty, Inc v. Fryar,* 120 NC App. 178, 461 S.E.2d 29 (1995).

## III. Substantive Issues

{7} The single critical issue in this case is whether or not Praxair's rights contained in the RFR have been violated. Affording the complaint in this action its broadest interpretation requires that the Court examine two possibilities. First, the complaint can be read to assert a claim that the Joint Venture Agreement itself constitutes a breach of the RFR. For the reasons set forth below, the Court finds as a matter of law that it does not. Second, the complaint can be read to assert a claim that the Joint Venture Agreement is a sham or fake. The complaint contains both express and implied allegations that National Welders and the Turner Family entered into an agreement by which Airgas has, in fact, obtained a controlling interest in the voting stock of National Welders and that the Joint Venture Agreement was designed to disguise the true agreement. This theory of the complaint holds that the Joint Venture Agreement is a fake and not the genuine agreement between the parties. Under this second interpretation of the complaint, plaintiff has stated a claim upon which relief may be granted and the complaint is not subject to dismissal on the pleadings.

> **A. Count One adequately asserts a claim for relief based upon an alleged agreement that Airgas will acquire 100% of the voting capital stock of National Welders.**

### 1. The express terms of the Joint Venture Agreement do not violate Praxair's rights in the RFR.

{8} It is apparent from the Joint Venture Agreement that it was carefully and artfully drafted in an effort to avoid or negate any claim that the written agreement itself violated the RFR. Airgas and the Turners were keenly aware not only of the RFR but also of Praxair's resolve to enforce it in the event of any effort by Airgas to acquire National Welders. (Compl. Ex. C.) Accordingly, the Joint Venture Agreement appears to be drafted not just to avoid triggering the language used in the RFR, but also to proactively create a transaction that differed from that contemplated by the terms of the RFR. Praxair argues that defendants have not been successful in avoiding the express terms of the RFR.

{9} Plaintiff argues that the Joint Venture Agreement expressly violates the terms of the RFR because Airgas should be deemed to have acquired 100% of the voting stock in National Welders when the agreement was signed. Praxair's argument is based upon its interpretation of the definitions of "Fully Diluted Basis" and "Shares" in the RFR. Plaintiff's argument is erroneous for several reasons.

{10} First, the Joint Venture Agreement expressly provided that Airgas would acquire only 47% of National Welders voting shares. That percentage does not trigger any rights in Praxair under the RFR. In addition, as a safety net, the Joint Venture Agreement specifically provided that the preferred stock delivered to the Turners "shall exceed fifty percent (50%) of the voting capital stock of [National Welders] that will be actually outstanding, and that will be outstanding on a fully diluted basis." *See* Jt. Venture Agmt. Para. 2.4.2.

{11} In order to reach or exceed the acquisition of more than 50% of the voting rights required to trigger the RFR, Praxair urges the Court to interpret the Joint Venture Agreement provisions which give the Turners certain rights as actually creating an option to Airgas to obtain shares in National Welders. It would be error to do so because the Joint Venture Agreement does not give Airgas any "option" as that term is used in the RFR. The Joint Venture Agreement gives the Turners the choice of doing four things after July of 2006. First, they may exchange with National Welders their preferred shares for Airgas common shares. Second, they may redeem their preferred shares for cash from National Welders. Third, they may hold their preferred voting stock and collect a 5% dividend. Fourth, they could sell some or all of their shares if they could find a market for such a security. Each of these choices is a contract right. Each is exercisable only after 2006 and each is exercisable only by the Turners, not Airgas. The exercise of each contractual right does not result in the creation or acquisition of options, warrants or any other security convertible into or exchangeable for shares of stock in National Welders. The definition of "Fully Diluted Basis" requires that in calculating percentage ownership effect must be given "to the exercise of any and all options, warrants and other *securities* which are convertible into or exchangeable for *shares."* (emphasis added.) "*Shares"* is defined as National Welders authorized capital stock. The drafters of the Joint Venture Agreement successfully avoided creating an option covered by the terms of the RFR by not giving Airgas, the Turners, or anyone else an option convertible or exchangeable for National Welders shares and postponing the exercise of the contractual rights until after July 2006. Praxair argues that the Turners contract rights are the equivalent of an "option" to do something that effects the percentage calculation in such a way that Airgas could become a 100% owner of National Welders capital stock. That possible effect is undeniable, but not covered by the express terms of the RFR which must be strictly construed. The term "option" as used in the Joint Venture Agreement refers to a form of security convertible or exchangeable into another security: shares of National Welders. It cannot be interpreted to mean any contract right afforded the Turner Family.

{12} The Joint Venture Agreement by its express terms does not violate the express terms of the RFR. If the inquiry ended there, defendants would be entitled to have their motions granted. However, the complaint contains allegations that Airgas and the Turners have entered into an agreement that is not limited to, and may in fact be contrary to, the express terms of the Joint Venture Agreement.

### 2. Plaintiff has adequately alleged the existence of an agreement that would violate its

**rights under the RFR.**

{13} Praxair has alleged that the Turners and Airgas have already agreed that Airgas will acquire 100% of the voting capital stock of National Welders. If that allegation is true, Praxair's rights under the RFR have been violated. The allegations contained in paragraphs 1, 14, 15 and 16 of the complaint are sufficient to allege such an agreement. The allegations that this is a "done deal" and that an agreement has been made that the Turners will trade in their National Welders stock for cash or Airgas stock shortly after the RFR expires save the complaint from dismissal. Such an agreement would remove the uncertainty that the written agreement itself incorporates by preserving to the Turners the right to retain their preferred stock or sell it to someone other than Airgas. Defendants' argument that such an oral side agreement would be unenforceable is of no avail. Such an oral agreement might be unenforceable if the Turners tried to back out of the deal and Airgas tried to enforce it. However, if both parties abided by such an oral agreement, they would have violated Praxair's rights under the RFR and enforceability would not be an issue. Proof of such an agreement will, of necessity, be circumstantial. In essence, plaintiff must prove that the risk to Airgas created by the Joint Venture Agreement that the Turners would either retain their stock or sell it to someone else does not exist.

{14} To the extent that the complaint can be read to assert a cause of action for breach of contract based upon diminishment of value of the RFR by entry into the Joint Venture Agreement, the complaint does fail to state a cause of action. The RFR is specific with respect to the conditions that give rise to Praxair's right to meet an offer for purchase of a controlling interest in National Welders. It left National Welders and the Turners free to enter into any other business arrangement that did not trigger Praxair's rights. If those arrangements diminished the value of Praxair's rights under the RFR, or even made it less likely that Praxair would ever have the opportunity to exercise its right of first refusal, such arrangements would not give rise to a cause of action for breach of contract if they did not trigger the obligation to give Praxair its right of first refusal.

{15} Accordingly, the Court holds that the complaint fails to state a cause of action for breach of contract or breach of duty of good faith and fair dealing as alleged in Count One to the extent that cause of action is based upon the existence and implementation, according to its terms, of the Joint Venture Agreement. Count One of the complaint does state a cause of action for breach of contract and breach of duty of good faith and fair dealing in that it alleges that the Turner Family, National Welders and Airgas have agreed that 100% of National Welders stock will be sold to Airgas in a two-step transaction beginning in 1996 and ending shortly after Praxair's Right of First Refusal expires in 2006. It is the existence of that agreement which Praxair must prove.

### B. Count Two for Tortious Interference with Contract against Airgas should not be dismissed.

{16} Plaintiff has alleged the existence of a valid contract under which National Welders and the Turner Family owed an obligation to Praxair and that Airgas, acting with knowledge of the contract and without justification, damaged Praxair by intentionally inducing National Welders and the Turner Family to breach their obligation. Since the complaint states a cause of action for breach of contract based upon the allegation that an agreement exists for the sale of 100% of National Welders stock to Airgas, Count Two should not be dismissed. If such an agreement is proven, it could provide the basis for a claim of tortious interference with contract. If the alleged agreement is not proven, Count Two will fail. Airgas had the right to negotiate with National Welders and to do so without Praxair's knowledge. Airgas had a right to compete in any way that did not induce National Welders and the Turner Family to breach their contract with Praxair.

### C. Count Three for Tortious Interference with Prospective Advantage against Airgas should be dismissed.

{17} Plaintiff alleges that this cause of action is identical to tortious interference with contract except that

instead of interfering with an existing contract right, defendant interferes with a prospective contract right. Under this theory Praxair seeks to recover not for an induced breach of the RFR, but for the actions of Airgas which resulted in Praxair not being able to acquire National Welders. The problem with this theory in this case is that Airgas had a legitimate right to negotiate with and bid for National Welders. There was nothing in the RFR that prohibited that action, and Airgas was legally free to compete with Praxair in the acquisition of similar companies. It therefore had a lawful justification for its acts and Praxair's complaint fails to state a cause of action because its is missing the critical element of lack of justification required under a cause of action for tortious interference with prospective advantage.

### D. Count Four for Unfair Trade Practices against National Welders, Airgas, the Turner Shareholders and Sult states a limited cause of action for violation of N.C. Gen. Stat.§ 75-1.1 against the Defendants other than Sult.

{18} Tortious interference with a competitor's right of first refusal to buy a business which both competitors are interested in acquiring constitutes an unfair trade practice. If the company being acquired and its shareholders that are party to the right of first refusal deliberately and secretly conceal their breach from the competitor holding the right of first refusal, they may have committed an unfair trade practice. To the extent that the complaint can be read to allege that the Joint Venture Agreement was a sham and a disguise to conceal the real agreement between the Turners and Airgas (that the Turners would not exercise any rights under the Joint Venture Agreement which would prohibit Airgas from obtaining 100% of the stock of National Welders), it states a claim for violation of Chapter 75. Absent proof of the undisclosed agreement, Praxair has failed to state a claim under Chapter 75. It follows that the claim against Mr. Sult, who is not alleged to be a party to any agreement at issue, should be dismissed.

### E. Count Five for Civil Conspiracy states a limited cause of action against National Welders, the Turners and Airgas, but not Mr. Sult. Therefore, it also supports a claim for punitive damages.

{19} To the extent the complaint can be read to allege that the Joint Venture Agreement was a sham and a disguise to conceal the real agreement between the Turners and Airgas (that the Turners would not exercise any rights under the Joint Venture Agreement which would prohibit Airgas from obtaining 100% of the stock of National Welders), it states a claim for fraud and civil conspiracy to commit fraud. If the fraud claim can be proven, it would support a claim for punitive damages. The Court has reviewed the complaint with respect to the specific allegations of conduct by Mr. Sult and finds that there are insufficient allegations to state a claim for relief based upon civil conspiracy with respect to Mr. Sult, and those claims against him should be dismissed.

### IV. Conclusion

{20} The Joint Venture Agreement as written does not violate the terms of the RFR. The terms of the RFR must be strictly construed since the RFR is a restraint on the transfer of ownership. The RFR provides limited rights to Praxair under specific conditions. The drafters of the Joint Venture Agreement were successful in avoiding triggering Praxair's rights under the RFR primarily because the agreement left Airgas at risk that whoever owned or controlled the Turner Family stock in 2006 could elect to retain ownership of the stock or sell it to someone else. Even though there were strong incentives built into the agreement for the Turners to exchange their National Welders stock for cash or Airgas stock after the RFR expired, the written agreement provided no guarantee that they would do so, and it left the Turner Family in the position of being able to chose its course of action based upon the circumstances in existence in the year 2006. If, however, the Turners and Airgas have agreed that the Turners will sell or exchange their National Welders stock for Airgas stock or cash regardless of the conditions in 2006, thus eliminating any risk to Airgas that it would be left owning 47% of National Welders, Praxair's contractual rights have been violated. That breach, combined with an effort to disguise the true agreement, would support the causes of action for tortious interference, unfair trade practices and civil conspiracy.

Based upon the foregoing, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

1. The claims in the complaint asserted against Defendant Errol Sult are dismissed.

2. Plaintiff's Count Three: Tortious Interference with Prospective Economic Advantage Against Airgas, is dismissed.

3. Defendants' motions to dismiss the remaining counts in the complaint are denied.

4. The discovery schedule in this case previously set by the Court will run from the date of this order set forth below.

This 26th day of May, 1999.