Reid Pointe, LLC v. Stevens, 2008 NCBC 15.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
08 CVS 4304

REID POINTE, LLC, TUCKER CHASE, LLC,
MEADOW, LLC, SOUTHEASTERN LAND
INVESTMENTS, LLC, KYLIGLEN, LLC,
HARRY C. GRIMMER, and HARRY C.
GRIMMER AND ASSOCIATES, LLC,

        Plaintiffs,

      v.

CHARLES A. STEVENS and CAROLINA
DEVELOPMENT OF CHARLOTTE, INC.,

        Defendants.

ORDER & OPINION

*Bishop, Capitano, & Moss, P.A. by J. Daniel Bishop for Plaintiffs.*

*James, McElroy & Diehl, P.A. by Edward T. Hinson, Jr. for Defendants.*

Diaz, Judge.

{1}     Before the Court is Plaintiffs' Motion for Judgment on the Pleadings as to Defendants' Counterclaims (the "Motion").

{2}     After considering the Motion, the briefs of the parties, and the arguments of counsel, the Court **GRANTS** in part and **DENIES** in part Plaintiffs' Motion.

I.

PROCEDURAL BACKGROUND

{3}     On 26 February 2008, Plaintiffs filed their Complaint in this case.

{4}     The Complaint seeks a declaratory judgment with respect to the parties' rights under a series of real estate development agreements. (Compl. ¶¶ 32–35.)

{5}     The Complaint also asserts claims for (1) breach of fiduciary duty; (2) constructive fraud; (3) conversion; (4) unfair and deceptive trade practices; and (5) breach of contract.

{6}     On 26 March 2008, Defendants answered the Complaint and filed Counterclaims asserting claims for (1) dissolution of the five limited liability companies created pursuant to the parties' real estate development agreements; (2) breach of contract; and (3) unfair and deceptive trade practices.

{7}     On 15 May 2008, Plaintiffs filed the Motion and a supporting brief.

{8}     Defendants filed a response brief on 4 June 2008.

{9}     Plaintiffs filed a reply brief on 18 June 2008.

{10}    The Court heard oral argument on the Motion on 10 July 2008.

II.

THE FACTS

A.

THE PARTIES

{11}    Plaintiff Harry C. Grimmer and Associates ("Grimmer Associates") is a North Carolina limited liability company.  Plaintiff Harry C. Grimmer ("Grimmer") is the sole member of Grimmer Associates.  (Compl. ¶ 2.)[1]

{12}    Defendant Carolina Development of Charlotte, Inc. ("CDC") is a North Carolina corporation.  Defendant Charles A. Stevens and his wife are the sole owners of CDC.  (Compl. ¶ 4.)

{13}    Plaintiffs Meadow, LLC ("Meadow"), Tucker Chase, LLC ("Tucker Chase"), Reid Pointe, LLC ("Reid Pointe"), Southeastern Land Investments, LLC ("Southeastern") and Kyliglen, LLC ("Kyliglen"), are North Carolina limited liability companies (herein collectively referred to as the "LLCs").  (Compl. ¶ 6.)

{14}    Meadow, Tucker Chase, Reid Pointe and Kyliglen were created to develop real property as residential subdivisions.  (Compl. ¶ 7.)

---

[1] The Court refers to Grimmer and Grimmer Associates collectively as the "Grimmer Plaintiffs."

{15}     Southeastern was created to hold for resale parcels within each of the Reid Pointe and Tucker Chase subdivisions.  (Compl. ¶ 8.)

{16}     Grimmer Associates and CDC are the sole members of Meadow.  (Compl. ¶ 6.)

{17}     Grimmer and CDC are the sole members of Tucker Chase, Reid Pointe and Southeastern.  (Compl. ¶ 6.)

{18}     Grimmer and CDC (along with non-party John R. Poore) are the sole members of Kyliglen.  (Compl. ¶ 8; Countercl. ¶ 3.)

B.

THE COUNTERCLAIMS

{19}     In 2003, Stevens and John R. Poore approached Grimmer to propose a partnership to acquire and develop real property in North Carolina.  (Countercl. ¶¶ 1–2.)

{20}     Grimmer agreed to provide the financing for the project, and the three created Kyliglen to hold the property.  (Countercl. ¶¶ 1–2.)

{21}     Stevens subsequently assigned his interest in Kyliglen to CDC.  (Countercl. ¶ 3.)

{22}     Following their partnership in Kyliglen, Stevens and Grimmer discussed the prospect of forming other real estate ventures.  (Countercl. ¶ 4.)

{23}     On 24 September 2003, the parties executed a letter outlining their "proposed working relationship."  (Am. Reply Ex. A (hereinafter the "Letter Agreement").)

{24}     Among other things, the parties agreed to form a new LLC for each development project.  (Am. Reply Ex. A.)

{25}     The Letter Agreement contemplated that Grimmer and Stevens would be members of the LLCs, but that each would have a different role and ownership interest.  (Am. Reply Ex. A.)

{26}     Grimmer, as a 70% owner of the LLCs, would be primarily responsible for financing the projects.  (Am. Reply Ex. A.)

{27}   Specifically, Grimmer assumed responsibility for "us[ing] [his] financial connections with a local lender to obtain the necessary financing . . . in the [sic] an amount sufficient to provide for all project costs . . . that would carry the financial requirements of the project for approximately one year."  (Am. Reply Ex. A.)

{28}   Stevens, on the other hand, would own 30% of the LLCs and be responsible for managing each company's "day-to-day affairs."  (Am. Reply Ex. A.)

{29}   In 2004, Stevens and Grimmer created Reid Pointe, Tucker Chase, Meadow, and Southeastern, as contemplated by the terms of the Letter Agreement. (Countercl. ¶ 10.)[2]

{30}   Each LLC was governed by an identical Operating Agreement entered into by Grimmer (or Grimmer Associates in the case of Meadow) and CDC.  (Compl. ¶ 9.)

{31}   Reid Pointe, Tucker Chase, and Meadow also entered into separate Land Development Construction and Management Services Agreements (the "Development Agreements") with CDC, setting forth CDC's construction, development, and marketing responsibilities with respect to each parcel of land. (Compl. ¶¶ 13–15.)

{32}   For each project, CDC developed draft budgets in accordance with the terms of the respective Operating and Development Agreements.  (Countercl. ¶ 11.)

{33}   Defendants allege that heightened regulation in the construction industry, coupled with extreme price increases in the cost of construction materials, resulted in significant cost overruns for the development projects.  (Countercl. ¶¶ 14–17.)

{34}   Defendants also allege that Grimmer was well aware of these circumstances and was also partly to blame for the cost overruns.  (Countercl. ¶¶ 15, 18.)  According to Defendants, Grimmer intervened in project management

---

[2] Reid Pointe involved the development of property in Lancaster County, South Carolina.  (Mot. J. Pleadings Ex. D.)  The remaining LLCs were created to develop property in North Carolina.  (Mot. J. Pleadings Exs. A–C, E.)

issues on several occasions (despite the expectation that he would serve primarily as a financial backer), which resulted in added and unnecessary expenses. (Countercl. ¶ 18.)

{35} Among other things, Defendants assert Grimmer required Meadow to pay $100,000.00 in excess invoices to his brother-in-law's employer and caused Tucker Chase to terminate a profitable contract in order to benefit his son. (Countercl. ¶¶ 18–19.)

{36} In January 2008, Grimmer offered to redeem CDC's member interest in Reid Pointe for $3000.00 (Countercl. ¶ 23.) When CDC refused, Defendants allege Grimmer embarked on a calculated campaign to drive CDC out of the LLCs. (Countercl. ¶ 28.)

{37} Defendants assert Grimmer demanded that the LLCs no longer pay CDC for its services under the Development Agreements and (to that end) arranged to freeze the LLCs' bank accounts. (Countercl. ¶ 24.)

{38} Defendants further allege that Grimmer contacted numerous vendors and financial institutions and made damaging and untrue statements about Defendants to cripple the LLCs' operations and facilitate Grimmer's scheme to seize control. (Countercl. ¶¶ 25–26.)

{39} Defendants also assert that Grimmer, as majority member of each LLC, removed CDC as manager of the LLCs. (Countercl. ¶ 29.) Shortly thereafter, according to Defendants, Grimmer began (1) harassing Defendants repeatedly for information relating to the operation of the LLCs that Defendants had already provided; and (2) making capital calls for each entity, knowing full well that CDC would be unable to meet the calls and thus would be forced to forfeit its member interests. (Countercl. ¶¶ 28–30.)

III.

CONTENTIONS OF THE PARTIES

A.

JUDICIAL DISSOLUTION

{40}    Defendants contend that judicial dissolution of the LLCs is proper under section 57C-6-02 of the North Carolina General Statutes on two grounds: (1) that the assets of the LLCs are being misapplied and wasted; and (2) that such action is required to protect the rights and interests of CDC.

{41}    Plaintiffs respond that Defendants have failed to assert any specific factual allegations in support of this claim, making it ripe for dismissal.

B.

BREACH OF CONTRACT

{42}    Defendants have asserted three separate bases for their breach of contract claim.

{43}    First, Defendants allege that CDC performed services pursuant to the Tucker Chase and Reid Pointe Development Agreements for which it has not been paid.

{44}    Second, Defendants allege that Grimmer failed to arrange and secure the necessary financing to complete the Tucker Chase and Reid Pointe projects, which, according to Defendants, constitutes a material breach of the Letter Agreement.

{45}    Third, Defendants assert that Grimmer has withheld CDC's pro-rata portion of profits from Meadow.

{46}    With respect to the fees allegedly owed CDC under the Tucker Chase and Reid Pointe Development Agreements, Plaintiffs contend the underlying contracts are illegal and therefore not enforceable because CDC is not licensed as a general contractor in North Carolina or a construction manager in South Carolina.[3]

---

[3] CDC admitted at the hearing of this matter that it does not hold such licenses.

{47}    According to Plaintiffs, the Development Agreements require CDC to render services that constitute general contracting in North Carolina and construction management in South Carolina.  Because CDC never obtained the requisite licensing to engage in such work, Plaintiffs contend CDC may not recover fees under the contracts.

{48}    Plaintiffs also dispute Defendants' breach of contract claims based on the Letter Agreement.

{49}    Plaintiffs contend the Letter Agreement merely constitutes an agreement to agree, and in any event, is superseded by the parties' subsequently-executed Operating Agreements, which deal thoroughly with Grimmer's financing obligations *vis-à-vis* the LLCs.

{50}    Plaintiffs also argue that Grimmer has not breached the financing terms of the Letter Agreement.  According to Plaintiffs, the Letter Agreement did not impose an open-ended commitment on Grimmer to provide financing, but instead limited his financing obligations to a period of one year, with which he has fully complied.

{51}    Finally, as to Defendants' allegations relating to Plaintiffs' failure to distribute profits from the Meadow venture, Plaintiffs argue that Defendants have failed to identify the contract and term breached by the alleged failure to distribute profits.  According to Plaintiffs, the Meadow Operating Agreement does not require the distribution of profits, but rather provides that any such distribution is within the manager's discretion.

C.

UNFAIR AND DECEPTIVE TRADE PRACTICES

{52}    Defendants contend the following actions of the Grimmer Plaintiffs support a claim for unfair and deceptive trade practices under section 75-1.1 of the North Carolina General Statutes: (1) using their superior position in the LLCs to discharge CDC as manager without good cause; (2) making untrue and damaging statements about CDC to various suppliers, service providers and regulators; and

(3) denying payments due to CDC and at the same time demanding a capital call from CDC.

{53}　Plaintiffs respond that Defendants' unfair and deceptive trade practices claim is ripe for dismissal because the allegations (1) are insufficient to support the elements of an independent tort and amount to nothing more than a simple breach of contract; and (2) describe internal corporate governance matters not involving commerce.

IV.

PRINCIPLES OF LAW

A.

MOTION FOR JUDGMENT ON THE PLEADINGS

{54}　The purpose of a motion for judgment on the pleadings pursuant to Rule 12(c) of the North Carolina Rules of Civil Procedure is "to dispose of baseless claims or defenses when the formal pleadings reveal their lack of merit." *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974).

{55}　"In considering a motion for judgment on the pleadings, the trial court is required to view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the non-moving party." *Am. Bank & Trust Co. v. Elzey*, 26 N.C. App. 29, 31, 214 S.E.2d 800, 802 (1975).

{56}　A motion for judgment on the pleadings should be denied "unless it is clear that [the non-moving party] is not entitled to any relief under any statement of the facts." *Praxair, Inc. v. Airgas, Inc.*, 1999 NCBC 5 ¶ 5 (N.C. Super. Ct. May 26, 1999), http://www.ncbusinesscourt .net/opinions/1999%20NCBC%205.htm (citing *Arroyo v. Scottie's Prof'l Window Cleaning, Inc.*, 120 N.C. App. 154, 461 S.E.2d 13 (1995)).

B.

JUDICIAL DISSOLUTION

{57} Under North Carolina law, a trial court may dissolve a limited liability company if a member establishes one of the following four things:

> (1) the managers, directors, or any other persons in control of the limited liability company are deadlocked in the management of the affairs of the limited liability company, the members are unable to break the deadlock, and irreparable injury to the limited liability company is threatened or being suffered, or the business and affairs of the limited liability company can no longer be conducted to the advantage of the members generally, because of the deadlock; (2) liquidation is reasonably necessary for the protection of the rights or interests of the complaining member; (3) the assets of the limited liability company are being misapplied or wasted; or (4) the articles of organization or a written operating agreement entitles the complaining member to dissolution of the limited liability company.

N.C. Gen. Stat. § 57C-6-02(2) (2007).

{58} Judicial dissolution is a remedy left largely to the discretion of the trial court, and this is so even where a party establishes a statutory ground for dissolution. *See Royals v. Piedmont Elec. Repair Co.*, 137 N.C. App. 700, 704, 529 S.E.2d 515, 518 (2000) (citing *Foster v. Foster Farms, Inc.*, 112 N.C. App. 700, 706, 436 S.E.2d 843, 847 (1993)).

C.

GENERAL CONTRACTORS/CONSTRUCTION MANAGERS

{59} Section 87-1 of the North Carolina General Statutes defines a general contractor as

> any person or firm or corporation who for a fixed price, commission, fee, or wage, undertakes to bid upon or to construct or who undertakes to superintend or manage, on his own behalf or for any person, firm, or corporation that is not licensed as a general contractor pursuant to this Article, the construction of any building, highway, public utilities, grading or any improvement or structure where the cost of the undertaking is thirty thousand dollars ($30,000) or more.

N.C. Gen. Stat. § 87-1 (2007).

{60}    The phrase "undertakes to superintend or manage" is correspondingly defined by regulation to refer to the actions of one who "is responsible for superintending or managing the entire construction project, and either contracts directly with subcontractors to perform the construction for the project or is compensated for superintending or managing the project based upon the cost of the project or the time taken to complete the project."  21 N.C. Admin. Code 12.0208 (2007).

{61}    Similarly, South Carolina defines a construction manager as

an entity working for a fee whose duties are to supervise and coordinate the work of design professionals and multiple prime contractors, while allowing the design professionals and contractors to control individual operations and the manner of design and construction.   Services provided by a construction manager may include:

(a) coordination, management, or supervision of design or construction;
(b) cost management, including estimates of construction costs and development of project budgets;
(c) scheduling, which may include critical path techniques, for all phases of a project;
(d) design review, including review of formal design submission and construction feasibility; and
(e) bid packaging and contractor selection.

S.C. Code Ann. § 40-11-20(5) (2007).

{62}    One who undertakes a project as a general contractor in North Carolina or a construction manager in South Carolina is required to comply with the licensing requirements of that state.  *See* N.C. Gen. Stat. § 87-10; S.C. Code Ann. § 40-11-320.

{63}    An unlicensed contractor/construction manager may not recover for work performed in violation of the relevant statutes.  *Ron Medlin Constr. v. Harris*, 658 S.E.2d 6, 9 (N.C. Ct. App. 2008) (citing *Builders Supply v. Midyette*, 274 N.C. 264, 270, 162 S.E.2d 507, 511 (1968)); *W & N Constr. Co. v. Williams*, 472 S.E.2d 622, 623 (S.C. 1996).

D.

BREACH OF CONTRACT

{64}    The elements of a claim for breach of contract are: (1) existence of a valid contract; and (2) breach of the terms of that contract. *Lake Mary Ltd. P'ship v. Johnston*, 145 N.C. App. 525, 536, 551 S.E.2d 546, 554 (2001) (citing *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000)).

{65}    Where the terms of a contract are clear and unambiguous, the contract must be interpreted as written. *See Martin v. Vance*, 133 N.C. App. 116, 121, 514 S.E.2d 306, 309 (1999) (citation omitted).  In such instances, construction is a matter of law for the court; the court's only duty is to determine the legal effect of the language used and to enforce the agreement as written. *Atl. & E. Carolina Ry. Co. v. S. Outdoor Adver., Inc.*, 129 N.C. App. 612, 617, 501 S.E.2d 87, 90 (1998).

{66}    On the other hand, where the language of the contract is fairly and reasonably susceptible to either of the constructions asserted by the parties, its interpretation is a question for the jury. *Carolina Place Joint Venture v. Flamers Charburgers, Inc.*, 145 N.C. App. 696, 699, 551 S.E.2d 569, 571 (2001) (citation omitted).

{67}    Whether the language of a contract is ambiguous or unambiguous is a matter for the Court to determine. *Anderson v. Anderson*, 145 N.C. App. 453, 458, 550 S.E.2d 266, 269 (2001) (citation omitted).  In making this determination, words are to be given their usual and ordinary meaning and all the terms of the agreement are to be reconciled if possible. *Id.* at 458, 550 S.E.2d at 269–70.

E.

UNFAIR AND DECEPTIVE TRADE PRACTICES

{68}    To state a claim under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1 to 75-16 (the "UDTPA"), a plaintiff must allege "(1) defendants committed an unfair or deceptive act or practice, (2) in or affecting commerce and (3) plaintiff was injured as a result." *Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*, 172 N.C. App. 427, 439, 617 S.E.2d 664,

671 (2005) (citing *Edwards v. West*, 128 N.C. App. 570, 574, 495 S.E.2d 920, 923 (1998)).

{69}   Generally, proof of an independent tort is sufficient to make out a separate UDTPA claim. *See Sara Lee Corp. v. Carter*, 351 N.C. 27, 31–33, 519 S.E.2d 308, 311–12 (1999) (finding that the breach of a fiduciary duty by an employee also gave rise to an UDTPA claim); *Governor's Club, Inc. v. Governors Club Ltd. P'ship.*, 152 N.C. App. 240, 250, 567 S.E.2d 781, 788 (2002) ("Allegations sufficient to allege constructive fraud are likewise sufficient to allege unfair and deceptive trade practices."); *Norman W. Drouillard & Print Purchasing Consultants, Inc. v. Keister Williams Newspaper Servs., Inc.*, 108 N.C. App. 169, 171–73, 423 S.E.2d 324, 326–27 (1992) (holding that a violation of the Trade Secrets Protection Act may also be a violation of the UDTPA); *Roane-Barker v. Se. Hosp. Supply Corp.*, 99 N.C. App. 30, 41, 392 S.E.2d 663, 670 (1990) (holding that a claim alleging tortious interference with contract also makes out an UDTPA violation).

{70}   However, to sustain an UDTPA cause of action in this context, the predicate tort must be validly alleged. *See Craven v. Cope*, 656 S.E.2d 729, 734 (N.C. Ct. App. 2008).

{71}   On the other hand, "[a] mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1." *Mitchell v. Linville*, 148 N.C. App. 71, 75, 557 S.E.2d 620, 623 (2001) (quoting *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992)).

{72}   To be actionable under the UDTPA, the breach must be accompanied by "substantial aggravating circumstances." *Johnson v. Colonial Life & Accident Ins. Co.*, 173 N.C. App. 365, 370, 618 S.E.2d 867, 871 (2005).

{73}   Additionally, matters relating to internal corporate governance and capital-raising activities are not sufficiently "in or affecting commerce" to form the basis for an unfair and deceptive trade practices claim. *See HAJMM Co. v. House of Raeford Farms*, 328 N.C. 578, 594, 403 S.E.2d 483, 493 (1991) (stating that the trade, issuance, and redemption of corporate securities or other capital-raising

devices are not "in or affecting commerce" and therefore are not covered by the UDTPA); *see also Maurer v. SlickEdit, Inc.*, 2005 NCBC 1 ¶ 40 (N.C. Super. Ct. May 16, 2005), http:// www.ncbusinesscourt.net/opinions/2005%20ncbc%201.htm (dismissing a claim for unfair and deceptive trade practices because the allegations related to matters of internal corporate affairs and operations and not the regular business activities of the corporation).

## V.
## ANALYSIS
### A.
### JUDICIAL DISSOLUTION

{74}    Defendants assert two grounds for judicial dissolution of the LLCs.

{75}    First, Defendants assert that "Grimmer has demonstrated that he is not capable to competently manage the affairs of the LLCs at issue and thus the assets of [the] limited liability companies [are being and] will be misapplied or wasted under the management of Grimmer." (Countercl. ¶ 33, Dissolution ¶ 3.)

{76}    However, as Plaintiffs point out, Defendants fail to allege any specific action or conduct on the part of Grimmer that constitutes waste or demonstrates the misapplication of the LLCs' assets.

{77}    Without more, Defendants' allegation that the assets of the LLCs are and will continue to be misapplied and wasted is insufficient to sustain a claim for judicial dissolution. *See Daniels v. Montgomery Mut. Ins. Co.*, 320 N.C. 669, 682–83, 360 S.E.2d 772, 780 (1987) (stating that the court is only required to accept the truth of the non-moving party's factual allegations on a motion for judgment on the pleadings, not the party's conclusions of law).

{78}    Defendants also argue that judicial dissolution is necessary to protect their rights and interests in the LLCs, asserting that Grimmer has engaged in a series of actions to take over the LLCs and squeeze out CDC's interest in each of these entities. (Countercl. ¶ 28.)

{79}     Among other things, Defendants allege Grimmer (1) refused to pay CDC for services it provided pursuant to the parties' Development Agreements; (2) removed CDC as manager of the LLCs; (3) openly criticized CDC to various vendors, service providers, and banking institutions; (4) initiated capital calls, with which he knew CDC could not comply; and (5) refused to provide information to CDC regarding the operation of the LLCs, including refinancing details and project status reports.  (Countercl. ¶¶ 24–26, 28–29, 31.)

{80}     Applying an indulgent standard to Defendants' pleading, these allegations relating to the deteriorating relationship between Grimmer and CDC are sufficient to allow Defendants to pursue their claim that liquidation is reasonably necessary to protect Defendants' rights and interests in the LLCs.[4] Accordingly, Plaintiffs' Motion is **DENIED** as to this claim.

B.

BREACH OF CONTRACT

1.

DEVELOPMENT AGREEMENTS

{81}     CDC contends Grimmer breached the Reid Pointe and Tucker Chase Development Agreements by refusing to pay it for services provided pursuant to the agreements.  According to CDC, Grimmer owes $291,717.00 under the Reid Pointe Development Agreement and $144,476.00 under the Tucker Chase Development Agreement.  (Countercl., Breach of Contract ¶ 2.)

{82}     Plaintiffs argue, however, that CDC may not recover for breach of these agreements because CDC was not licensed as a general contractor in North Carolina or a construction manager in South Carolina.  The Court disagrees.

{83}     The purpose of a state's general contractor licensing requirements is to protect the public from incompetent builders.  *See, e.g.*, *Dellinger v. Michal*, 92 N.C. App. 744, 747, 375 S.E.2d 698, 699 (1989); *Watson v. Harmon*, 312 S.E.2d 8, 11 (S.C. Ct. App. 1984).

---

[4] As noted earlier, however, the Court retains ultimate discretion to decide whether dissolution is appropriate on the equities presented.

{84}    Although the Court's research has not disclosed any binding precedent on point, there is persuasive authority suggesting that the denial of contract remedies to unlicensed general contractors or construction managers should properly be restricted to circumstances where the contractor seeks compensation for work falling within the statutory definition of general contracting or construction management.  *See generally McCarroll v. L.A. County Dist. Council of Carpenters*, 315 P.2d 322, 336 (Cal. 1957) (stating that the failure to obtain the requisite license does not render the unlicensed entity "completely outside the protection of the law and den[y] relief from torts committed against them or breaches of contract other than contracts to recover compensation"); *Ranchwood Cmtys. P'ship v. Jim Beat Constr. Co.*, 57 Cal. Rptr. 2d 386, 393 (Cal. Ct. App. 1996) (stating that an unlicensed contractor may maintain a cause of action for breach of contract unrelated to his construction work).

{85}    Here, the Tucker Chase and Reid Pointe Development Agreements require CDC to, among other things, (1) develop construction schedules with all contractors; (2) supervise, coordinate and expedite construction of all site improvements per approved construction drawings; (3) schedule and supervise the installation of on-site utilities; and (4) coordinate construction surveying and engineering services necessary for site improvements, staking of lot corners, etc. (Mot. J. Pleadings Exs. C–D.)

{86}    The Agreements, however, also require Plaintiffs to compensate CDC for its work in (1) selling all the lots in the project; (2) developing marketing and advertising budgets; (3) implementing approved marketing plans; (4) writing the contracts for the purchase of all lots; and (5) hiring and supervising sales managers and sales personnel.  (Mot. J. Pleadings Exs. C–D.)

{87}    Thus, even assuming that some of the work undertaken by CDC pursuant to the Agreements requires a general contracting or construction management license, other portions of the work do not.

{88}    Because the pleadings do not specify to what work the fees sought in Defendants' Counterclaim relate and, in light of the indulgent standard the Court

must apply to a claim for relief at this stage, the Court **DENIES** Plaintiffs' Motion as to this claim.

## 2.

## LETTER AGREEMENT

{89}    Defendants also contend Grimmer breached the Letter Agreement by failing to secure financing with respect to the Tucker Chase and Reid Pointe projects.

{90}    Plaintiffs dispute that the Letter Agreement is a binding contract. Regardless, Plaintiffs assert this claim should be dismissed because Grimmer has fully complied with the Letter Agreement.

{91}    The Letter Agreement purports to require Grimmer to "obtain the necessary financing . . . in the [sic] an amount sufficient to provide for all project costs . . . that would carry the financial requirements of the project for approximately *one year*." (Am. Reply Ex. A (emphasis added).)

{92}    This language is clear and unambiguous. It requires only that Grimmer secure LLC financing for project costs for one year, which the Court construes as requiring Grimmer to obtain financing during the first year startup for each LLC.

{93}    Defendants do not dispute that the LLCs were formed in 2004 and therefore have been operating for over three years. (Answer ¶ 6.) Additionally, Defendants concede that the parties enjoyed a satisfactory working relationship until December 2007 or January 2008, when (according to Defendants) Grimmer failed to provide continued financing for the LLCs. (Countercl. ¶¶ 22, 27.)

{94}    As such, even assuming the Letter Agreement is a binding contract, Grimmer has fully complied with its terms by obtaining financing for each LLC during its initial year of operation.

{95}    Accordingly, the Court **GRANTS** Plaintiffs' Motion as to this claim.

3.

UNDISTRIBUTED PROFIT

{96}   Defendants' final contention is that Grimmer (in his capacity as Meadow's manager) failed to make a pro-rata distribution of Meadow's profits to CDC.  Defendants argue that Grimmer's refusal to distribute this profit is actionable as a breach of contract.

{97}   Plaintiffs respond that Defendants failed to adequately plead this cause of action by not specifying the precise contract and terms breached by Grimmer.

{98}   According to Plaintiffs, the only provisions that address the distribution of profits are found in the Meadow Operating Agreement, and those provisions expressly provide that any such distribution is within the discretion of the manager.

{99}   The Court agrees with Plaintiffs.  Because Defendants have failed to identify the specific contract and term breached by Grimmer with respect to Meadow's undistributed profit, the claim for breach of contract fails as a matter of law.  *See Claggett v. Wake Forest Univ.*, 126 N.C. App. 602, 608, 486 S.E.2d 443, 446 (1997) ("To state a claim for breach of contract, the complaint must allege that a valid contract existed between the parties, that defendant breached the terms thereof, the facts constituting the breach, and that damages resulted from such breach.").  Moreover, to the extent Defendants rely on the terms of the Meadow Operating Agreement to support their breach of contract claim, Defendants have failed to allege facts supporting an abuse of discretion by Plaintiffs as to the distribution of profits.

{100}  Accordingly, the Court **GRANTS** Plaintiffs' Motion as to this claim.

C.

UNFAIR AND DECEPTIVE TRADE PRACTICES

{101} Defendants cite several instances of conduct by Grimmer that they contend amount to an UDTPA violation.[5]  This claim too, however, fails as a matter of law.

{102} Defendants first allege that the Grimmer Plaintiffs "den[ied] payments due to CDC" and failed to provide "loans and bank financing as expressly promised in previous agreements."  (Countercl., Unfair and Deceptive Trade Practices ¶ 3.)

{103} But, as Plaintiffs point out, the former alleges, if anything, merely a breach of the Reid Pointe and Tucker Chase Development Agreements and the latter merely a breach of the Letter Agreement.  As such, they cannot form the basis for a UDTPA claim.  *See Mitchell*, 148 N.C. App. at 75, 557 S.E.2d at 623 ("[A]ctions for unfair or deceptive trade practices are distinct from actions for breach of contract, . . . and a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1.").

{104} Defendants next contend that the Grimmer Plaintiffs' use of their "superior position in the LLCs to discharge CDC as manager without good cause" and their "demand[s] [for] a capital call from CDC" are unfair or deceptive acts or practices in or affecting commerce.  (Countercl., Unfair and Deceptive Trade Practices ¶ 3.)

{105} The term "commerce" under section 75-1.1, however, "connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized."  *HAJMM Co.*, 328 N.C. at 594, 403 S.E.2d at 493.

{106} In this case, Grimmer's removal of CDC as manager and his demands for capital calls are primarily matters of internal corporate governance that do not relate to the day-to-day business activities of the LLCs.  Accordingly, these matters

---

[5] Although the facts alleged in the Counterclaim refer only to acts committed by Grimmer, Defendants purport to bring an UDTPA claim against Grimmer and Grimmer Associates.

are not sufficiently "in or affecting commerce" to sustain an UDTPA claim. *Maurer*, 2005 NCBC 1 ¶ 40 (dismissing a claim for unfair and deceptive trade practices because the allegations related to matters of internal corporate affairs and operations and not the regular business activities of the corporation).

{107} Third, Defendants contend that Grimmer "ma[de] untrue and damaging statements about CDC to various suppliers, service providers and regulators." (Countercl., Unfair and Deceptive Trade Practices ¶ 3.) Defendants also assert that Grimmer "communicated unfavorably" with government regulators and banking institutions. (Countercl. ¶ 26.)

{108} According to Defendants, such actions have "undermin[ed] the confidence of the service providers of the LLCs" and "compromised the ability of the LLCs to obtain necessary permitting and approvals," and therefore are actionable as unfair and deceptive trade practices. (Countercl. ¶¶ 25–26.)

{109} While proof of an independent defamation claim may be sufficient to make out a separate UDTPA claim, the predicate tort must nevertheless be validly alleged. *Craven*, 656 S.E.2d at 734.

{110} In North Carolina, a claim for defamation must be described "with sufficient particularity" so as "to enable the court to determine whether the statement, was [, in fact,] defamatory." *Andrews v. Elliot*, 109 N.C. App. 271, 274, 426 S.E.2d 430, 432 (1993) (quoting *Stutts v. Duke Power Co.*, 47 N.C. App. 76, 83–84, 266 S.E.2d 861, 866 (1980)). Additionally, Rule 9(f) of the North Carolina Rules of Civil Procedure requires the plaintiff to plead the time and place of any alleged defamatory statement. N.C.R. Civ. P. 9(f).

{111} Defendants' allegations fail to state a claim for defamation. Not only do Defendants fail to describe sufficiently the alleged defamatory statements, but they also fail to allege the time and place of such statements. Absent facts supporting a valid claim for defamation, Defendants' UDTPA claim also fails.

{112} Defendants' remaining contentions are also insufficient to sustain their UDTPA claim.

{113}   Defendants' allegations that Grimmer (1) persuaded banks to freeze the LLCs' accounts, (2) terminated Tucker Chase's contract with a vendor to confer a benefit on his son, and (3) intervened in the management of Meadow to pay his brother-in-law's employer a $100,000.00 premium, implicate only the rights and interests of the LLCs, not those of Stevens or CDC.

{114}   The right to pursue a cause of action based on this conduct therefore belongs solely to the LLCs, and Defendants' attempt to assert an UDTPA claim on these grounds fails.  *See Regions Bank v. Reg'l Prop. Dev. Corp.*, 2008 NCBC 8 (N.C. Super. Ct. Apr. 21, 2008), http://www.ncbusinesscourt.net/opinions/ 2008%20NCBC%208.pdf (dismissing defendant's counterclaim because the allegations related to general corporate harm and therefore the defendant lacked standing to assert an individual cause of action).

{115}   Finally, Defendants' allegation that Grimmer "harassed" Defendants with repeated demands for information already in his possession, without more, is not enough to make out an UDTPA claim.

{116}   Accordingly, the Court **GRANTS** Plaintiffs' Motion as to this claim.


VI.

CONCLUSION

{117}   The Court **GRANTS** Plaintiffs' Motion as to Defendants' UDTPA claim and those portions of Defendants' breach of contract claim alleging that Grimmer failed to secure financing for the LLCs and distribute profits earned by Meadow. Those claims are dismissed with prejudice.

{118}   In all other respects, the Court **DENIES** the Motion.


This the 18th day of August, 2008.