Scott v. Lackey, 2012 NCBC 58.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
11 CVS 19560

JACK P. SCOTT, Individually and
Derivatively on Behalf of BlackHawk
Capital Management LLC (a Delaware
Limited Liability Corporation),

Plaintiff,

v.

WILLIAM "MAC" LACKEY, Individually
and In His Capacity as Member and
Officer of BlackHawk Capital
Management, LLC;
ROSS SALDARINI, Individually and In
His Capacity as Member and Officer of
BlackHawk Capital Management, LLC;
and CHEROKEE-BOWIN ALPHA, LP,

Defendants,

and

BLACKHAWK CAPITAL
MANAGEMENT, LLC,

Nominal Defendant.

ORDER & OPINION

*Nexsen Pruet, PLLC by William R. Terpening and Christopher C. Lam for Plaintiff Jack P. Scott*

*Lincoln Derr PLLC by Sara R. Lincoln, Tricia Morvan Derr, and Morgan K. Laurie for Defendants William "Mac" Lackey and Ross Saldarini*

*Erwin Bishop Capitano & Moss PA by Joseph W. Moss, Jr. for Nominal Defendant BlackHawk Capital Management, LLC*

Murphy, Judge.

{1}     **THIS MATTER** is before the Court upon Defendants William "Mac" Lackey ("Lackey"), Ross Saldarini ("Saldarini"), and Cherokee-Bowin Alpha, LP's ("CBA") (collectively "Defendants") Motion to Dismiss Plaintiff's Complaint pursuant to Rule 12(b)(6) ("Defendants' Motion I") and Motion to Remove Jack Scott

as Derivative Representative ("Defendants' Motion II"); and Plaintiff Jack P. Scott's ("Plaintiff") Motion for Leave to Amend his Complaint ("Plaintiff's Motion to Amend").

{2}     After considering the Complaint, the written motions, submissions, and contentions of the parties at the April 25, 2012, hearing, the Court **GRANTS**, in part, and **DENIES**, in part, Defendants' Motion I; **DENIES** Defendants' Motion II; and **GRANTS** Plaintiff's Motion to Amend.

I.

PROCEDURAL HISTORY

{3}     Plaintiff brought this action against Defendants by filing a Verified Complaint on October 21, 2011, in Mecklenburg County.  (V. Compl. 34.)  In his Complaint, Plaintiff asserts against Defendants both direct claims and derivative claims on behalf of BlackHawk Capital Management, LLC ("BHCM").

{4}     On October 24, 2011, Plaintiff filed a notice of designation to the North Carolina Business Court.  The case was designated a mandatory complex business case and assigned to this Court.

{5}     Pursuant to the General Rules of Practice and Procedure for the North Carolina Business Court Rule 17.1, the parties filed a Joint Case Management Report ("CMR") on December 7, 2011, in which both parties agreed that all derivative claims would be governed by Delaware law, and all other issues "not specifically related to the construction of the BHCM [Operating Agreement] and/or claims against Defendants who are not parties to the BHCM [Operating Agreement would be] governed by North Carolina law."  (Case Mgmt. Rpt. at 7–8.)

{6}     On December 12, 2011, Defendants filed their Answer.  Included with the Answer were Defendants' Motions I and II.  As bases for the motions, Defendants allege: (a) that Plaintiff lacks standing to bring direct claims; (b) that Plaintiff failed to adhere to the demand requirement for derivative actions; (c) that an Exculpation and Indemnification clause exists that bars certain liability; and (d) that the Complaint fails to state a claim upon which relief may be granted.  (Defs.' Ans. 1–2; Defs.' Supp. Br. Mot. Dismiss 3–22.)

{7}  As Nominal Defendant, BHCM joined, in part, Defendants' Motions I and II on December 21, 2011.  (Nom. Def. Joins Defs.' Mot. Dismiss 2; Nom. Def. Joins Defs.' Mot. Remove 2.)

{8}  On February 16, 2012, Plaintiff moved to amend his Verified Complaint by adding three new claims and an additional party defendant.  (Pl.'s Mot. Am. Compl. 4.)

{9}  The Court held a hearing on all three motions on April 25, 2012.

II.

FACTUAL BACKGROUND

{10}  Ordinarily, this Court does not make findings of fact in connection with motions to dismiss pursuant to Rule 12(b)(6), as such motions do "not present the merits, but only [determine] whether the merits may be reached."  *Concrete Serv. Corp. v. Investors Group, Inc.*, 79 N.C. App. 678, 340 S.E.2d 755, 758 (1986).  For purposes of the Court's analysis, the Court recites only those facts from the pleadings that are relevant to the Court's legal determinations.

{11}  On a motion to remove a derivative plaintiff, the Court may consider additional matters outside of the pleadings, in addition to the allegations set forth in the Complaint.  *See supra* Section III.C.1.  While the Court sets out the relevant facts gleaned from the affidavits and extrinsic materials submitted for Defendants' Motion II, the Court considers only those facts set out in Plaintiff's Complaint in its resolution of Defendants' Motion I.

A.

FACTUAL ALLEGATIONS RELEVANT TO A DETERMINATION OF ALL MOTIONS

{12}  BHCM is a limited liability company incorporated in Delaware and doing business in Charlotte.  (V. Compl. ¶ 3.)  It has six members, three of whom are managers.  (V. Compl. ¶ 3.)  As an investment firm, BHCM offers investors access to various investments through the firm's funds.  (V. Compl. ¶ 13.)

{13}  Plaintiff, a resident of Mecklenburg County, is a member-manager of BHCM and holds a 23.86% ownership interest in the company.  (V. Compl. ¶¶ 4, 80.)

{14} Defendants Lackey and Saldarini, also residents of Mecklenburg County, are the remaining member-managers and each shares equal ownership interest in BHCM with Plaintiff. (V. Compl. ¶¶ 5–6.) The three non-managing members of BHCM are Cherokee Associates Limited Partnership ("Cherokee"), Robert C. Hayes ("Hayes"), and Bowin Alpha Fund, LLC ("Bowin"). (V. Compl. ¶ 21.)

{15} As member-managers, Lackey oversaw "firm strategy, investor relations and capital raise [sic] efforts," while Saldarini managed the financial aspects of the business. (V. Compl. ¶¶ 18–19.) Plaintiff's responsibilities "included oversight and involvement in all activities of the investment funds." (V. Compl. ¶ 20.)

{16} In relevant part, the firm's Operating Agreement designates the laws of the state of Delaware to govern the agreement. (V. Compl. ¶ 16; Ex. A § 14.7.) Article VIII of the Operating Agreement also provides an exculpation clause that exempts all Officers and Managers from liability "to any other Officer, Manager, Member or the Company for any loss suffered by the Company." (V. Compl. Ex. A § 8.1.) Section 8.4, however, prohibits reliance on this clause for "any loss, damage or other liability caused by such Person's fraud, bad faith, gross negligence, or willful misconduct." (V. Compl. Ex. A § 8.4.) In addition, section 8.2.2 unambiguously provides that the Members and Managers have no duty to report competing business opportunities, and that failure to disclose such an opportunity will not constitute the breach of any duty. (V. Compl. Ex. A. § 8.2.2.)

{17} The Operating Agreement also specifies that distributions of BHCM funds may only be made to members and must be "pro rata based upon each Member's Capital Percentage, unless otherwise approved by a Super Majority . . . ." (V. Compl. ¶¶ 22, 27; Ex. A § 5.1(a).) The agreement defines a Super Majority as at least "80% of the Interests of all . . . Members." (V. Compl. ¶ 23.) Therefore, as alleged by Plaintiff, all distributions must be on a pro rata basis to members unless approved by over 80% of the total ownership. (V. Compl. ¶ 23.)

{18} Notwithstanding the foregoing provisions, section 13.1 of the Operating Agreement empowers the Managers, in their sole discretion, to make distributions to the Members with Preferences at any time. (V. Compl. Ex. A § 13.1.1.) The

Operating Agreement defines a member with a "Preference" as a member to whom BHCM is indebted. (V. Compl. Ex. A § 1.1.44.) Accordingly, any payments made pursuant to section 13.1 would be applied to offset the debt owed by the company, and would require approval by only a majority of the managers. (V. Compl. Ex. A § 13.1.)

{19} Plaintiff alleges that, on or around June 2 or June 3, 2011, Lackey and Saldarini transferred $400,000 from BHCM to Cherokee-Bowin Alpha, LLC ("CBA"), an unrelated entity that operated as a shell company for Cherokee, Bowin, and Hayes. (V. Compl. ¶¶ 24, 26.) Plaintiff further alleges that Lackey and Saldarini initially characterized the transfer to CBA as a "distribution" to a non-member, but that the distribution was made without Plaintiff's knowledge and was not made pro rata. (V. Compl. ¶¶ 24–29.)

{20} After the initial transfer, CBA conveyed $300,000 of the "distribution" to KYCK.com ("Kyck), a Delaware corporation located in Charlotte, North Carolina. (V. Compl. ¶¶ 7, 31.) Although Kyck had no direct connection to or relationship with BHCM, Plaintiff alleges that Lackey and Saldarini owned and managed Kyck and improperly used BHCM funds as start-up capital for Kyck. (V. Compl. ¶¶ 8, 32–33.)

{21} According to Plaintiff, neither Lackey nor Saldarini notified him about the transfer until he confronted them after reading about Kyck in a *Charlotte Observer* article in late July 2011. (V. Compl. ¶ 34.) Plaintiff claims Lackey and Saldarini took steps to conceal the transfer when Saldarini failed to mention it on April 25, 2011, during a presentation about upcoming financial projections. (V. Compl. ¶ 36.) Plaintiff also alleges that Saldarini circulated a May 2011 presentation that proposed diversifying BHCM's interests by investing in new ventures and falsely claimed that BHCM would receive an equity position in the new venture through this investment. (V. Compl. ¶¶ 37–38.) In addition, Plaintiff alleges that Lackey evaded questions about the transfer's true purpose, and that Lackey and Saldarini attempted to conceal the true purpose from Plaintiff. (V. Compl. ¶¶ 45–53.)

{22}  In late July, Plaintiff discovered the transfer from BHCM and contacted Dow Bauknight ("Bauknight"), the owner and operator of Cherokee, a BHCM member.  (V. Compl. ¶¶ 41, 51.)  Although he initially claimed ignorance, Bauknight later admitted that he knew about the transfer.  In subsequent discussions with Plaintiff, Defendants insisted that Bauknight fully supported the transfer.  (V. Compl. ¶¶ 41–42.)

{23}  When Plaintiff expressed additional concerns about the transfer and demanded that Defendants handle it properly, Plaintiff alleges that Lackey and Saldarini claimed the transfer was a Preference to lower BHCM's debt to Bauknight.  (V. Compl. ¶¶ 45, 51.)  According to Plaintiff, Lackey and Saldarini re-characterized the "distribution" as a "Preference" to conceal their improper actions because the transfer materially affected BHCM's operating budget.  (V. Compl. ¶¶ 52–54, 140.)

{24}  In addition to the $400,000 transfer, Plaintiff outlines other benefits Defendants siphoned off from BHCM including use of BHCM's office space as headquarters for Kyck without paying rent, relying on BHCM's staff for Kyck tasks, devoting too much time to Kyck while receiving their salaries from BHCM, and paying for Kyck expenses with BHCM funds.  (V. Compl. ¶¶ 59–72.)  Each of these actions, Plaintiff argues, was an intentional breach of Lackey and Saldarini's contractual and fiduciary duties to BHCM and to Plaintiff.  (V. Compl. ¶¶ 95, 107, 115.)

{25}  In a letter to Lackey and Saldarini dated September 11, 2011, Plaintiff demanded corrective action.  (V. Compl. ¶ 91.)  Lackey and Saldarini refused to take corrective measures.  (V. Compl. ¶ 92.)  Not only did Lackey and Saldarini refuse Plaintiff's demand, they also refused to meet with Plaintiff or address his concerns.  (V. Compl. ¶¶ 91–92.)

{26}  In early August 2011, Plaintiff alleges that Lackey and Saldarini "sent emails, placed phone calls, and made statements in meetings" to Hayes, Bauknight, and investors that suggested Plaintiff "was incompetent, negligent, a 'rogue trader,' [] not acting in the best interests of BHCM," and "trading for his own interest."  (V.

Compl. ¶¶ 49–50, 180.)  According to Plaintiff, these statements impugned Plaintiff's work with BHCM, and caused him to lose the support of other members and potential investors.  (V. Compl. ¶¶ 182–83.)

{27}  Based on the transfer of funds and benefits to CBA and Kyck, Plaintiff brought this action asserting both direct and derivative claims against Lackey and Saldarini for breach of the Operating Agreement, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, fraud, constructive fraud, and fraudulent concealment; and asserting claims against CBA for conversion and unjust enrichment.  Plaintiff also included in his Complaint a direct claim for defamation against Lackey and Saldarini based on statements made to third parties.  (V. Compl. 18–33.)

B.

ADDITIONAL FACTS CONSIDERED IN RESOLUTION OF DEFENDANTS' MOTION II

{28}  After Plaintiff discovered the disputed transfer to CBA and Kyck, he prepared a document, dated August 17, 2011, outlining a proposed course of action ("Updated Proposed Solution") and submitted it to the other members.  (Defs.' Br. Supp. Mot. Remove Ex. A.)  In the Updated Proposed Solution, Plaintiff suggested that Lackey and Saldarini take on a silent, minority role in BHCM, leaving Plaintiff as the sole manager and majority shareholder.  (Defs.' Br. Supp. Mot. Remove Ex. A.)

{29}  In his September 11, 2011, demand letter, Plaintiff again outlined his plan for resolving the parties' dispute, including Plaintiff's desire that Lackey and Saldarini relinquish their positions in BHCM.  (Defs.' Br. Supp. Mot. Remove Ex. C at 4.)[1]  The letter made clear that, if Lackey and Saldarini did not agree to the proposed conditions or come to a satisfactory compromise, Plaintiff would pursue legal action.  (Def.' Br. Supp. Mot. Remove Ex. C at 4.)  Plaintiff also raised several

---

[1] As correctly pointed out by the parties, North Carolina Rules of Evidence Rule 408 bars the admission of settlement offers "to prove liability for or invalidity of the claim or its amount," but it does not exclude the evidence when it is offered for another purpose.  N.C. R. Evid. 408.  Therefore, since the parties submit the letter for a purpose other than proving liability on the underlying claims, the Court will consider it for purposes of Defendants' Motion II and need not address its admissibility in other matters before the Court.

individual claims in the letter, including his current claim for defamation.  (Def.' Br. Supp. Mot. Remove Ex. C at 4.)

{30}   After negotiations failed and Plaintiff opted to proceed with legal action, the other members of BHCM expressed their lack of support for Plaintiff's decision.  (Hayes Aff. ¶ 9; Bauknight Aff. ¶ 4.)  As a member of BHCM and representative of Bowin, another BHCM member, Hayes made clear that, while he initially supported Plaintiff's proposed resolutions, he did not support Plaintiff's lawsuit.  (Hayes Aff. ¶¶ 3–10.)  As representative of BHCM member Cherokee, Bauknight also stated that he did not approve of the lawsuit.  (Bauknight Aff. ¶ 4.)

III.

LEGAL ANALYSIS

A.

GOVERNING LAW

{31}   BHCM's incorporation under the laws of Delaware requires the Court to first address which state's law will govern with respect to Defendants' Motions I and II.  In accordance with the choice of law provision in the Operating Agreement, the parties do not dispute that Delaware law governs all claims related to the Operating Agreement, and that North Carolina law governs the tort claims and the claims against CBA as a non-member.  (Case Mgmt. Rpt. at 7–8; V. Compl. Ex. A § 14.7); *see also* N.C. GEN. STAT. § 57C-7-01 (2011) ("[T]he laws of the state . . . under which a foreign limited liability company is formed shall govern . . . the liability of its managers and members . . . ."); *Associated Packaging, Inc. v. Jackson Paper Mfg. Co.*, 2012 NCBC 13 ¶¶ 22–23 (N.C. Super. Ct. Mar. 1, 2012), http://www.ncbusiness court.net/opinions/2012%20NCBC%2013.pdf (concluding that the choice of law provision in a contract would rule the contract claims but not the tort claims).  However, the parties disagree on the law applicable to Defendants' Motion II and to determining whether Plaintiff has standing to assert direct claims under Defendants' Motion I.

{32}   Regarding Defendants' Motion I, Plaintiff argues that, because no interpretation of the Operating Agreement is required and no derivative claims are

involved, North Carolina law should govern the Court's determination of his standing to bring direct claims. (Pl.'s Br. Opp. Defs.' Mot. Dismiss 4–5.) However, the Court's conclusions with respect to Plaintiff's standing to bring direct claims rests on the determination of whether the causes of action may be properly pursued derivatively or directly. In such circumstances, North Carolina courts "look to the laws of the state in which the company is incorporated to determine the procedural prerequisites and whether the claim is derivative or individual." *Technik v. WinWholesale, Inc.*, 2012 NCBC 5 ¶ 25 (N.C. Super. Ct. Jan. 13, 2012), http://www.ncbusinesscourt.net/ opinions/2012_NCBC_ 5.pdf (quoting *Maurer v. SlickEdit, Inc.*, 2005 NCBC 1 ¶ 26 (N.C. Super. Ct. May 16, 2005), http://www.ncbusinesscourt.net/opinions/2005%20NCBC%201.htm).[2] Because BHCM is a limited liability company formed in Delaware, the Court looks to Delaware law to determine Plaintiff's standing to bring his direct claims.

{33} In Defendants' Motion II for removal of Plaintiff as derivative representative, Defendants argue that, because both North Carolina and Delaware have adopted the federal standard for assessing the adequacy of a derivative plaintiff, the Court may look to both states for the governing law. (Defs.' Br. Supp. Mot. Remove 2.) While the Court notes that both states apply the same standard, *see Robbins v. Tweetsie R.R., Inc.*, 126 N.C. App. 572, 578–79, 486 S.E.2d 453, 456 (1997) *and Youngman v. Tahmoush*, 457 A.2d 376, 379 (Del. Ch. 1983), the Court will apply Delaware law as the law governing derivative claims and their procedural prerequisites. *See Technik*, 2012 NCBC 5 ¶ 25; N.C. GEN. STAT. § 57C-7-01 (2011). Although the North Carolina courts' interpretation of the federal

---

[2] While the Court notes that the business entity at issue here is a limited liability company and the entity at issue in *Technik* is a corporation, neither party argues in its briefs, and the Court sees no reason why, the law of corporate derivative suits should not apply to limited liability companies to determine the governing law for assessing whether claims may be brought individually or derivatively. Indeed, often, "[a] derivative action on behalf of an LLC will be governed by essentially the same rules that apply to a derivative action on behalf of a corporation, subject to some possible variations . . . ." *Robinson on North Carolina Corporation Law* § 34.04[5]; *see also Mitchell, Brewer, Richardson, Adams, Burge & Boughman, PLLC v. Brewer*, 705 S.E.2d 757 (N.C. Ct. App. 2011) *and Morris v. Scenera Research, LLC*, 2011 NCBC 33 ¶ 35 n.3 (N.C. Super. Ct. Aug. 26, 2011), http://www.ncbusinesscourt.net/opinions/2011_NCBC_33.pdf.

standard is persuasive, this Court concludes that Delaware law should govern the Court's analysis of Defendants' Motion II.

B.

DEFENDANTS' MOTION I

1.

STANDARD OF REVIEW ON 12(B)(6) MOTION

{34}   On a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the question is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987) (citation omitted).

{35}   In considering a motion to dismiss under Rule 12(b)(6), "'the well-pleaded material allegations of the complaint are taken as admitted; but conclusions of law or unwarranted deductions of fact are not admitted.'" *Sutton v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970).  If "the complaint alleges facts that defeat the claim, the claim should be dismissed." *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346, 511 S.E.2d 309, 312 (1999) (citation omitted).

2.

DIRECT CLAIMS

a.

PLAINTIFF'S STANDING TO CHALLENGE TRANSFER TO CBA AND KYCK

{36}   Under Delaware law, whether a plaintiff properly asserts direct or derivative claims "must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholder, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the suing stockholder, individually)?" *Tooley v. Donaldson*, 845 A.2d 1031, 1033 (Del. 2004).[3]  Thus, "[t]he stockholder's claimed direct injury must be independent of any

---

[3] *See also Kelly v. Blum*, 2010 Del. Ch. LEXIS 31 (2010) (applying the same standard to a limited liability company).  The Court in *Kelly* noted that "[s]ections 18-1001 to 18-1004 of the Delaware Limited Liability Company Act [] were modeled, in significant part, on the corporate derivative suit."

alleged injury to the corporation.  The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing any injury to the corporation." *Id.* at 1039.  To make this determination, the Court will not be bound by the plaintiff's classification of the claim as direct or derivative, but will look to the complaint as a whole to determine if the injury alleged falls directly on the company or the individual. *See In re Syncor Int'l Corp. S'holders Litig.*, 857 A.2d 994, 997 (Del. Ch. 2004).

{37}  Delaware courts typically refuse to extend standing for direct claims to plaintiffs alleging an injury arising solely from an ownership interest in the company, because their harm would be felt only secondarily to the direct harm to the company.  *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008) ("Where all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature.").  In particular, "Delaware courts have long recognized that actions charging 'mismanagement which depress[] the value of stock allege a wrong to the corporation . . . to be enforced by a derivative action.'" *Kramer v. Western Pacific Indus.*, 546 A.2d 348, 353 (Del. 1988) (alterations original) (citation omitted).

{38}  Here, Defendants argue the Plaintiff's claims for breach of the operating agreement, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, fraud, constructive fraud, fraudulent concealment, conversion, and unjust enrichment are all derivative in nature such that Plaintiff's direct claims under these causes of action should be dismissed.  (Defs.' Br. Supp. Mot. Dismiss 3–4.)  Each of these claims allegedly arose from Defendants' transfer of funds from BHCM to Kyck through CBA in violation of the Operating Agreement, and is, therefore, based on misconduct that resulted in injuries to BHCM and its members, proportionately.  Specifically, Plaintiff argues a direct injury from the loss of his

*Id.* at *37.  Therefore, since the case law interpreting derivative suits in the limited liability context is limited, the Court held "case law governing corporate derivative suits [to be] equally applicable to suits on behalf of an LLC . . . ." *Id.* (quotation and citation omitted); *see also VGS, Inc. v. Castiel*, 2003 Del. Ch. LEXIS 16 (Del. Ch. 2003).

23.86% share of the "distribution" and associated losses from the folding of BHCM. (V. Compl. ¶ 80.) However, the nature of the wrong alleged remains a misuse of company funds that directly injured BHCM and only indirectly injured Plaintiff as a percentage owner and member-manager. Also, and particularly fatal to the direct claims, Plaintiff cannot prevail without showing injury to BHCM since Plaintiff's injuries are based proportionally on the loss to BHCM.

{39} Furthermore, Plaintiff measures one form of his requested relief as a portion of the allegedly misappropriated funds. (V. Compl. 34.) This relief should be afforded to BHCM as the party that has been directly wronged, and only then would Plaintiff recover any proportional share owed to him under the Operating Agreement. Therefore, this Court concludes that, under Delaware law, Plaintiff's direct claims are derivative in nature, and that Plaintiff lacks standing to bring the direct actions.

{40} Accordingly, the Court **GRANTS** Defendants' Motion I as to Plaintiff's direct claims. Plaintiff's direct claims for breach of the Operating Agreement, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, fraudulent concealment, fraud, constructive fraud, conversion, and unjust enrichment are therefore **DISMISSED**, with prejudice.

b.

DEFAMATION

{41} "[I]n order to recover for defamation, a plaintiff must allege that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." *Holleman v. Aiken*, 193 N.C. App. 484, 495, 668 S.E.2d 579, 587 (2008). A claim for defamation encompasses both written defamation (libel) and oral defamation (slander). *Phillips v. Winston-Salem/Forsyth County Bd. of Educ.*, 117 N.C. App. 274, 277, 450 S.E.2d 753, 756 (1994) (citation omitted).

{42} "[A] claim for defamation must be described 'with sufficient particularity' so as 'to enable the court to determine whether the statement, was [,in fact,] defamatory." *Reid Pointe, LLC v. Stevens*, 2008 NCBC 15 ¶ 110 (N.C. Super. Ct.

Aug. 18, 2008), http://www.ncbusinesscourt.net/opinions/2008_NCBC_15.pdf (citing *Andrews v. Elliot*, 109 N.C. App. 271, 274, 426 S.E.2d 430, 432 (1993) (quoting *Stutts v. Duke Power Co.*, 47 N.C. App. 76, 266 S.E.2d 861 (1980))). While the allegations must describe at least the substance of the statement, a plaintiff need not quote the exact words communicated by defendant in his complaint. "[A] paraphrase could be sufficient." *Stutts*, 47 N.C. App. at 84, 266 S.E.2d at 866.

{43} North Carolina recognizes certain categories of false statements as slander *per se* or libel *per se*. If the claim falls within a "*per se*" category, then allegations of "the false remarks in themselves . . . may form the basis of an action for damages, in which case both malice and damages are, as a matter of law, presumed." *Donovan v. Fiumara*, 114 N.C. App. 524, 527, 442 S.E.2d 572, 574 (1994) (quoting *Beane v. Weiman Co.*, 5 N.C. App. 276, 277, 168 S.E.2d 236, 237 (1969)). For all other claims under defamation, known as libel and slander *per quod*, both malice and special damages through pecuniary loss must be alleged. *Id.*

{44} Statements that impeach the plaintiff in his trade or profession are one such category of false statements that would be actionable either as slander *per se* or libel *per se*. *Phillips*, 117 N.C. App. at 277. However, to fall within this class, "the defamatory statement must do more than merely harm a person in [his] business." *Mkt. Am., Inc. v. Christman-Orth*, 135 N.C. App. 143, 151, 520 S.E.2d 570, 577 (1999). "The false statement (1) must touch the plaintiff in [his] special trade or occupation, and (2) must contain an imputation necessarily hurtful in its effect on [his] business." *Id.* Therefore, while false statements asserting that the plaintiff is dishonest or unreliable may not be actionable *per se* on their own, they may become so when coupled with other statements impugning the plaintiff's business capabilities. *See Yates v. Brown*, 2012 NCBC 22 ¶¶ 28–29 (N.C. Super. Ct. Apr. 13, 2012), http://www.ncbusinesscourt.net/opinions/2012_NCBC_22.pdf (denying dismissal of slander claim based on statements that the plaintiff was "untrustworthy" and was "holding the company back") (citing *Tallent v. Blake*, 57 N.C. App. 249, 253, 291 S.E.2d 336 (1982)).

{45}   Here, Plaintiff alleges that Lackey and Saldarini sent emails, placed phone calls, and made statements at meetings to third parties in early August 2011, that suggested he "was incompetent, negligent, a 'rogue trader,' [] not acting in the best interests of BHCM," and "trading for his own interest." (V. Compl. ¶¶ 49–50, 180.) These statements allegedly caused Plaintiff to lose the support and investments of the other members and investors in BHCM, and directly impugned Plaintiff's profession. (V. Compl. ¶¶ 182–83.) Furthermore, the specific remarks that Plaintiff was a "rogue trader" and traded for his own interests directly impacted Plaintiff's work with investment funds, and could have dissuaded others from investing with him. Much like the court in *Yates*, this Court concludes that Plaintiff has adequately alleged statements that may be actionable *per se*.

{46}   Defendants argue, however, that the statements represent mere rhetorical hyperbole rather than factual assertions. To be actionable, a defamation claim must allege statements which state or imply a defamatory fact. *Daniels v. Metro Magazine Holding Co.*, 179 N.C. App. 533, 539, 634 S.E.2d 586, 590 (2006) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990)). "In determining whether a statement can be reasonably interpreted as stating actual facts about an individual, courts look to the circumstances in which the statement is made." *Id.* (citation omitted).

{47}   Here, Plaintiff asserts that Lackey and Saldarini made these statements through emails, phone conversations, and at meetings with various members and investors. (V. Compl. ¶¶ 49–50, 180.) Given the personal relationship between the parties and the dispute developing at the time, a reasonable listener could interpret their statements as actual fact. And, based on the allegations, the Court cannot conclude as a matter of law that the statements imputed to Defendants could not reasonably be interpreted as actual fact that might serve to defeat this claim at this stage of the proceedings. Therefore, taking the allegations as true, the Court concludes that Plaintiff adequately alleges a claim for defamation *per se*.

{48}   Defendants argue, however, that even if Plaintiff adequately alleged a defamation claim, the statements are protected by a qualified privilege.

> A qualified privilege exists when a communication is made: (1) on [a] subject matter (a) in which the declarant has an interest, or (b) in reference to which the declarant has a right or duty, (2) to a person having a corresponding interest, right, or duty, (3) on a privileged occasion, and (4) in a manner and under circumstances fairly warranted by the occasion and duty, right, or interest.

*Phillips*, 117 N.C. App. at 278, 450 S.E.2d at 756. This privilege "creates a presumption that the communication was made in good faith and without malice," which the plaintiff may rebut by showing actual malice. *Id.* (citation omitted).

{49} Plaintiff alleges that the subject matter of the communications centered on his conduct within BHCM, specifically his management of the investment funds. (V. Compl. ¶¶ 49–50, 180.) As member-managers of BHCM, Lackey and Saldarini owe fiduciary duties to BHCM, *see supra* Section III.3.e., and, therefore, they have an interest in the actions of the other member-manager within and on behalf of the company that could cause harm to BHCM and its members. And, as recipients of the communications, the other members and investors in BHCM share a corresponding interest in Plaintiff's conduct as member-manager in charge of the company's investment funds since Plaintiff's actions could impact their interest in the company. However, as discussed above, the allegations do not outline the specific circumstances or manner in which Lackey and Saldarini conveyed the statements. In the absence of allegations establishing that the statements were made on a privileged occasion and in a manner warranted by the circumstances, the Court cannot conclude as a matter of law that, at this stage of the case, the privilege exists to defeat Plaintiff's claim for defamation.

{50} Accordingly, the Court **DENIES** Defendants' Motion I as to Plaintiff's claim for defamation.

3.

DERIVATIVE CLAIMS

a.

DEMAND REQUIREMENT

{51} "The decision to bring a law suit or to refrain from litigating a claim on behalf of a [limited liability company] is a decision concerning the management of

the [company]. Consequently, such decisions are part of the responsibility of the [managers]." *Spiegel v. Buntrock*, 571 A.2d 767, 772–73 (Del. 1990). Members may, however, bring derivative actions on behalf of the company if certain prerequisites are met. *Id.* at 773. In particular, a member must first make a demand on the managers to initiate the lawsuit before the member will be allowed to bring a derivative suit. DEL. CODE ANN. tit. 6, § 18-1001 (2012). Even still, members may initiate a lawsuit without the approval of the managers "where they can show either that the board wrongfully refused the plaintiff's pre-suit demand to initiate the suit or, if no demand was made, that such a demand would be a futile gesture and therefore excused." *White v. Panic*, 783 A.2d 543, 550 (Del. 2001). To maintain a derivative claim, "the complaint [must] set forth with particularity the effort, if any, of the plaintiff to secure initiation of the action by a manager or member or the reasons for not making the effort." DEL. CODE. ANN. tit. 6, § 18-1003 (2012). Also, because courts apply the business judgment rule to determine if a board wrongfully refused a demand, *Spiegel*, 571 A.2d at 774, "the plaintiff must allege with particularity facts raising a reasonable doubt that the corporate action being questioned was properly the product of business judgment." *Brehm v. Eisner*, 746 A.2d 244, 254–55 (Del. 2000).

{52} "[T]he business judgment rule is a presumption that in making a business decision, not involving self-interest, the [managers of a LLC] acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Spiegel*, 571 A.2d at 774 (citation omitted). Thus, in reviewing the refusal of a demand under the business judgment rule, the Court looks to three issues: "(1) whether the [managers] acted independently and not self interestedly; (2) whether the [managers] reasonably investigated the basis for the proposed litigation; and (3) whether the [managers] refused to act in good faith." *Seaford Funding Ltd. P'ship v. M & M Assocs. II*, 672 A.2d 66, 70 (Del. Ch. 1995) (citing *Spiegel*, 571 A.2d at 777). Managers acting through self-interest may not claim the protection of the business judgment rule. *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). However, under Delaware law, "[b]y electing to make a

demand, a shareholder plaintiff tacitly concedes the independence of a majority of the board to respond." *Spiegel*, 571 A.2d at 777. As such, on a wrongful refusal argument, the Court will only examine whether the board acted reasonably and in good faith. If these requirements are met, then the decision not to pursue litigation must be respected and the motion to dismiss plaintiff's derivative action should be granted. *Id.*

{53} Even though making the demand concedes the disinterest of the managers at the outset, it does not concede that the managers will act in a disinterested manner in considering the demand. *Scattered Corp. v. Chicago Stock Exch.*, 701 A.2d 70, 74 (Del. 1997) (citing *Grimes v. Donald*, 673 A.2d 1207, 1218–19 (Del. 1996)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). As stated in *Chicago Stock Exch.*, "a board that appears independent *ex ante* may not necessarily act independently *ex post* in rejecting a demand. Failure of an otherwise independent-appearing board or committee to act independently is a failure to carry out its fiduciary duties in good faith or to conduct a reasonable investigation." 701 A.2d at 75. Therefore, although Plaintiff may not rely solely on the managers' self-interest on his wrongful refusal claim, their self-interest may be considered with regard to the managers' behavior, *ex post*, in response to the demand, as indicative of their good faith and reasonableness.

{54} Here, Plaintiff made a demand for corrective action but asserts that Defendants' wrongfully refused his demand. (V. Compl. ¶¶ 91–92; Pl.'s Br. Opp. Defs.' Mot. Dismiss 9.) Specifically, Plaintiff alleges with particularity that he sent a letter on September 11, 2011, to Defendants outlining his demand for corrective action with regard to the transfer from BHCM to Kyck. (V. Compl. ¶ 91.) As such, Delaware law requires the Court to presume Lackey and Saldarini's independence, for purposes of applying the business judgment rule. However, the Court concludes that the allegations of self-interest may be considered with regard to Lackey and Saldarini's exercise of good faith and reasonableness, but only as they pertain to Lackey and Saldarini's actions and behavior in response to Plaintiff's demand.

{55}  Lackey and Saldarini stood to benefit directly from the transfer of BHCM funds to their new company, Kyck. (V. Compl. ¶¶ 8, 32–33.) As such, their interest in the transaction appears unquestioned. Plaintiff also alleges that, after he brought his concerns to their attention and demanded corrective action, Lackey and Saldarini refused to meet with him or address his concerns. (V. Compl. ¶¶ 91–92.) Given that Lackey and Saldarini retained a stake in the challenged transfer, their refusal to meet with and address the issues underlying the possible lawsuit with Plaintiff, the sole disinterested manager, draws into question their good faith and reasonable investigation into the demand. The Court concludes that Plaintiff has sufficiently raised a reasonable doubt as to Lackey and Saldarini's exercise of proper business judgment in refusing his demand, and that he has structured his allegations with sufficient particularity to meet the demand requirement for his derivative claims.

b.

BUSINESS JUDGMENT RULE AND THE TRANSFER TO CBA

{56}  In addition to pleading facts to overcome the business judgment presumption for refusing the demand, "to survive a motion to dismiss, 'a plaintiff must [also] allege well pleaded facts to overcome the presumption'" with respect to the challenged action giving rise to the suit. *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999). "[T]he business judgment rule presumption . . . can be rebutted by alleging facts which, if accepted as true, establish that the board was [] interested in the outcome of the transaction." *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002). One way to accomplish this is to allege facts which show that a majority of the members of the board had a financial interest in the transaction. *Id.* "If such facts are sufficiently alleged, the business judgment rule is rebutted and [the] entire fairness standard of review is applicable." *N.J. Carpenters Pension Fund v. infoGROUP, Inc.*, 2011 Del. Ch. LEXIS 147, *26 (Del. Ch. 2011). The entire fairness standard shifts the burden to the defendant. *Id.* Therefore, "a 'plaintiff can survive a motion to dismiss under Rule 12(b)(6) by pleading facts from which a reasonable inference can be drawn that a majority of the board was interested or

lacked independence with respect to the relevant decision.'" *Id.* (quoting *In re Trados Inc. S'holder Litig.*, 2009 Del. Ch. LEXIS 128, *6 (Del. Ch. 2009)).

{57}  Here, Plaintiff challenges Defendants' decision to transfer funds from BHCM to CBA and Kyck and to use other BHCM assets for Kyck's operation. Although Defendants argue that the Operating Agreement allows BHCM members to pursue other business ventures (V. Compl. Ex. A §§ 6.3.2–6.3.3), the Operating Agreement does not expressly or implicitly allow the members to use BHCM funds and benefits in their individual pursuits.  Furthermore, there is no dispute that the actions taken benefited Kyck.  Because Lackey and Saldarini run Kyck (V. Compl. ¶ 8), the benefits to Kyck passed indirectly to them.  The Court concludes that a reasonable inference could be drawn from Plaintiff's allegations that Lackey and Saldarini had a financial interest in the challenged transactions, such that the allegations sufficiently rebut the presumption of the business judgment rule to survive a motion to dismiss.

c.

EXCULPATION CLAUSE

{58}  Even if the Court concludes that Plaintiff adequately stated his claims, Lackey and Saldarini argue that the Exculpation Clause in the Operating Agreement bars Plaintiff's claims for breach of the Operating Agreement, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty. (Defs.' Br. Supp. Mot. Dismiss 9.)

{59}  With regard to exculpation clauses, Delaware's Limited Liability Act provides as follows:

> A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager, or other person to a limited liability company or to another member or manager . . .; provided, that a limited liability company agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.

DEL. CODE ANN. tit. 6, § 18-1101(e) (2012). This provision is meant "to afford the maximum amount of freedom of contract, private ordering and flexibility to the parties involved." *TravelCenters of Am., LLC v. Brog*, 2008 Del. Ch. LEXIS 199, *3 (Del. Ch. 2008) (citation omitted). In fact, the provision goes even further than its analog in the Delaware Corporations Act "by allowing broad exculpation of *all* liabilities for breach of fiduciary duties- -including the duty of loyalty." *Kelly v. Blum*, 2010 Del. Ch. LEXIS 31, *50 (Del. Ch. 2010) (emphasis original).

{60} Here, the Exculpation Clause bars all liability for any loss to BHCM unless the loss results from the fraud, bad faith, gross negligence, or willful misconduct of the member sought to be held liable. (V. Compl. Ex. A §§ 8.1, 8.4.) Where an exculpation clause bars liability except for claims based on fraud, bad faith, or willful misconduct, "a plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter . . . ." *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008). Therefore, Plaintiff must allege knowledge or intent sufficient to show fraud, bad faith, gross negligence, or willful misconduct to overcome the Exculpation Clause on his breach claims. In particular, "Black's Law Dictionary defines 'willful' as [v]oluntary and intentional, but not necessarily malicious' . . . ." *Kelly*, 2010 Del. Ch. LEXIS at *52 (quoting BLACK'S LAW DICTIONARY 1630 (8th ed. 2004)).

{61} As discussed further below, Plaintiff premises all three breach claims on the $400,000 transfer from BHCM to CBA and Kyck and the use of other BHCM assets to further benefit Kyck. (V. Compl. ¶¶ 93–118.) As part of his claims, Plaintiff alleges that Lackey and Saldarini voluntarily approved the transfer of $400,000 to CBA along with the use of other benefits in violation of the Operating Agreement, and intentionally concealed the transfer from Plaintiff. (V. Compl. ¶¶ 24–29, 36–38, 45–53.) Taking the allegations as true, the Court concludes that Plaintiff has adequately alleged willful misconduct by Lackey and Saldarini. As such, the Exculpation Clause will not bar Plaintiff's claims for breach of the Operating Agreement, breach of the implied covenant of good faith and fair dealing, or breach of fiduciary duty at this stage.

d.

### BREACH OF OPERATING AGREEMENT

{62}   As among the members of the limited liability company, the Court treats a claim for breach of the Operating Agreement as a claim for breach of contract. "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

{63}   On behalf of BHCM, Plaintiff alleges that the $400,000 transfer to CBA and Kyck breached the Operating Agreement.[4]  In particular, Plaintiff points to section 5.1 of the Operating Agreement, which calls for all distributions to be made pro rata to members of the LLC.  (V. Compl. ¶ 95.)  The allegations then outline the breach of this obligation and resulting damage to BHCM through the loss of operating funds.  (V. Compl. ¶¶ 24–29, 100.)

{64}   Defendants argue that the $400,000 transfer was a Preference, not a distribution, requiring only a majority of the managers to approve, and does not have to be made pro rata.  (Defs.' Br. Supp. Mot. Dismiss 10; V. Compl. Ex. A § 13.1.)  Accepting the allegations as true, however, Defendants classified the transfer as a Preference only after the dispute with Plaintiff began.  (V. Compl. ¶¶ 45, 51.)  Before that time, and when the transfer was made, Defendants classified the transfer as a "distribution."  Per the terms of the Operating Agreement, distributions must be made pro rata to members.  (V. Compl. Ex. A § 5.1(a).)  As the $400,000 was not paid pro rata to a member of BHCM, such payment would have

---

[4] Plaintiff also alleges that Lackey and Saldarini breached the Operating Agreement by failing to live up to the duties of care and loyalty required of Officers under § 6.4.2.  The Court notes that the Operating Agreement allows for the appointment of Officers, but only if they are duly designated and appointed by the managers.  (V. Compl. Ex. A § 6.4.1.)  Here, the Complaint merely states that Lackey and Saldarini held themselves out as Officers.  (V. Compl. ¶¶ 18–19.)  Delaware does allow one to be a de facto officer of a corporation under certain circumstances.  *See Brehm v. Eisner*, 906 A.2d 27, 48 (Del. 2006).  However, this is an equitable doctrine intended to provide third parties with a means to sue those who hold themselves out as officers under apparent authority.  188 AM. JUR. 2D *Corporations* § 1229 (2012).  It does not apply to direct attacks related to internal disputes, since the parties involved would be aware that the individual had never been duly appointed.  *Id.*  As such, based on these facts, the Court cannot conclude that Lackey and Saldarini acted as appointed or de facto Officers of BHCM to allow for Plaintiff's breach of contract claim under this argument.

been in breach of the Operating Agreement.  (V. Compl. ¶ 24.)   Whether the transfer was in fact a Preference in compliance with the Operating Agreement presents a question of fact for resolution at a later stage of the case.  However, for purposes of this motion to dismiss, the Court concludes that Plaintiff has properly stated a claim for breach of contract on behalf of BHCM.

{65}   Accordingly, the Court **DENIES** Defendants' Motion I as to Plaintiff's derivative claim for breach of the Operating Agreement.

e.

BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

{66}   "Every contract contains an implied covenant of good faith and fair dealing that requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct . . . ."  *Fisk Ventures, LLC v. Segal*, 2008 Del. Ch. LEXIS 158, *37 (Del. Ch. 2008).  To state a claim for breach of the implied covenant of good faith and fair dealing, "plaintiff must allege a *specific implied contractual obligation* and allege how the violation of that obligation denied that plaintiff the fruits of the contract."  *Kelly*, 2010 Del. Ch. LEXIS at *59 (quoting *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 888 (Del. Ch. 2009)) (emphasis original).

{67}   Here, Plaintiff alleges an implied obligation that Lackey and Saldarini not "dissipate BHCM assets," and that they "act with fairness and in good faith, and in accordance with fair dealing."  (V. Compl. ¶¶ 105–06.)  By transferring money from BHCM to Kyck and using BHCM funds to pay for Kyck expenses, Plaintiff alleges and contends that Lackey and Saldarini breached this implied covenant and denied BHCM the fruits of the contract, including the ownership and use of the funds allegedly taken.  The Court concludes that Plaintiff has properly pled a claim for breach of the implied covenant of good faith and fair dealing.

{68}   Accordingly, the Court **DENIES** Defendants' Motion I as to Plaintiff's derivative claim for breach of the implied covenant of good faith and fair dealing.

f.

BREACH OF FIDUCIARY DUTY

{69}   "A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010).  Under the Delaware LLC Act, "members of an LLC [receive] wide latitude to order their relationship, including the flexibility to limit or eliminate fiduciary duties." *Bay Ctr. Apts. Owner, LLC v. Emery Bay PKI, LLC*, 2009 Del. Ch. LEXIS 54, *26 (Del. Ch. 2009); *see also* DEL. CODE ANN. tit. 6, § 18-1101(c) (2012).  However, unless otherwise stated in the LLC agreement, "the member-managers of a Delaware limited liability companies owe traditional fiduciary duties to the LLC and its members." *Phillips v. Hove*, 2011 Del. Ch. LEXIS 137, *65 (Del. Ch. 2011) (citing *William Penn P'ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011)).

{70}   Here, a close examination of the Operating Agreement reveals only one provision explicitly referencing the fiduciary duties of the managers or members of BHCM.  That provision simply forecloses a claim of breach of duty or obligation against a member or manager who fails to present the company with a corporate opportunity.  (V. Compl. Ex. A § 8.2.2.)  Given that "the drafters of chartering documents must make their intent to eliminate fiduciary duties plain and unambiguous," *Bay Ctr. Apts.*, 2009 Del. Ch. LEXIS at *31, the Court concludes that this provision does not eliminate all traditional duties owed by the managers to BHCM, beyond the failure to present the company with a corporate opportunity.  Therefore, the Court concludes that a fiduciary duty still exists between Lackey and Saldarini and BHCM under the terms of the Operating Agreement.

{71}   On behalf of BHCM, Plaintiff alleges that Lackey and Saldarini breached their fiduciary duties of loyalty and care by failing to act in the best interests of BHCM.  Specifically, Plaintiff asserts that by transferring $400,000 out of BHCM and using other BHCM assets to grow their new business, Lackey and Saldarini acted out of self-interest to the detriment of BHCM.  (V. Compl. ¶ 115.)  While the Operating Agreement allows the managers to pursue other opportunities without

having to inform or offer the opportunity to BHCM (V. Compl. Ex. A § 8.2.2), it does not authorize the managers to use BHCM funds and assets to pursue these opportunities. To the extent that Plaintiff alleges a breach beyond merely failing to disclose a corporate opportunity to BHCM, Plaintiff has adequately pled a cause of action for breach of fiduciary duty.

{72} Accordingly, the Court **DENIES** Defendants' Motion I as to Plaintiff's derivative claim for breach of fiduciary duty.

g.

FRAUD

{73} "The essential elements of fraud are: '(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.'" *Rowan County Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17, 418 S.E.2d 648, 658 (1992) (quoting *Terry v. Terry*, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981)).

{74} While Rule 9(b) of the North Carolina Rules of Civil Procedure allows intent and knowledge to be averred generally, the plaintiff must allege with particularity the "time, place and contents of the fraudulent representation, the identity of the person making the representation and what was obtained" to state a claim for fraud. *Terry*, 302 N.C. at 85, 273 S.E.2d at 678. In addition, the plaintiff must allege that he justifiably relied on the misrepresentation in that "he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999).

{75} Here, Plaintiff particularly alleges false statements made by Saldarini at a meeting in May 2011 misrepresenting the $400,000 expenditure, and other specific instances where Lackey and Saldarini attempted to conceal the circumstances surrounding the transaction. (V. Compl. ¶¶ 35–38, 136.) Plaintiff further alleges that these efforts allowed Lackey and Saldarini to transfer the money without question, and that this transfer materially affected BHCM's operating budget. (V.

Compl. ¶¶ 45–53, 140.)  Plaintiff also adequately alleges the remaining elements for fraud as laid out above.  (V. Compl. ¶¶ 141–42, 153.)

{76}  Regarding justifiable reliance, Plaintiff asserts that Lackey and Saldarini made the transfer and other expenditures without informing the company, and then took efforts to conceal these payments, which discouraged efforts to investigate.  (V. Compl. ¶¶ 25, 34–35, 44, 53, 143–48.)  In particular, Plaintiff points out that Lackey and Saldarini largely controlled the internal finances for BHCM, and that their control justified the company's reliance on their representations about the transfer.  (V. Compl. ¶ 135.)  Additionally, Lackey and Saldarini attempted to defeat investigations on behalf of BHCM by re-characterizing the transfer as a Preference retroactively and by ignoring requests to look into the matter.  (V. Compl. ¶¶ 44, 53.)  Accepting these allegations as true, the Court concludes that Plaintiff has alleged with particularity sufficient facts to support his claim for fraud on behalf of BHCM.

{77}  Accordingly, the Court **DENIES** Defendants' Motion I as to Plaintiff's derivative claim for fraud.

h.

CONSTRUCTIVE FRAUD

{78}  In North Carolina, an action for constructive fraud requires allegations of (1) a relationship of trust and confidence akin to that of a fiduciary and (2) that the defendant took advantage of that position of trust in order to benefit himself to the detriment of the plaintiff.  *Sterner v. Penn*, 159 N.C. App. 626, 631, 583 S.E.2d 670, 674 (2003).  "Put simply, a plaintiff must show (1) the existence of a fiduciary duty, and (2) a breach of that duty."  *Governor's Club, Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 249–50, 567 S.E.2d 781, 788 (2002).  Therefore, "a breach of fiduciary duty raises a presumption of constructive fraud . . . ."  *Bumgarner v. Tomblin*, 92 N.C. App. 571, 575, 375 S.E.2d 520, 523 (1989) (citing *Miller v. First Nat'l Bank of Catawba County*, 234 N.C. 309, 67 S.E.2d 362 (1951)).  Furthermore, Plaintiff alleges that Lackey and Saldarini breached their duty to BHCM to benefit their new company, Kyck, by providing it with start-up capital to the detriment of

BHCM's own funding.  (V. Compl. ¶¶ 8, 32–33, 59–72, 140.)  Having determined that Plaintiff adequately alleged a claim for breach of fiduciary duty that benefited Lackey and Saldarini to the detriment of BHCM, the Court concludes that Plaintiff's claim for constructive fraud has been sufficiently pled.[5]

{79}   Accordingly, the Court **DENIES** Defendants' Motion I as to Plaintiff's derivative claim for constructive fraud.

i.

FRAUDULENT CONCEALMENT

{80}   To successfully plead fraud by concealment, a plaintiff must allege:

> (1) the relationship [between plaintiff and defendant] giving rise to the duty to speak; (2) the event or events triggering the duty to speak and/or the general time period over which the relationship arose and the fraudulent conduct occurred; (3) the general content of the information that was withheld and the reason for its materiality; (4) the identity of those under a duty who failed to make such disclosures; (5) what [the defendant] gained by withholding information; (6) why plaintiff's reliance on the omission was both reasonable and detrimental; and (7) the damages proximately flowing from such reliance.

*Allran v. Branch Banking & Trust Corp.*, 2011 NCBC 21 ¶ 38 (N.C. Super. Ct. July 6, 2011), http://www.ncbusinesscourt.net/opinions/2011_NCBC_21.pdf (adopting *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 195–96 (M.D.N.C. 1997)).

{81}   Having previously concluded that a fiduciary relationship existed between the managers and BHCM, the Court concludes that Lackey and Saldarini had a duty to speak regarding the true purpose behind the transfer of funds and other expenditures from BHCM.  As Plaintiff alleges, the transfer and other expenditures that benefited Lackey and Saldarini's new company, Kyck, triggered the duty to speak regarding the true purpose of the expenditures.  (V. Compl. ¶¶ 121–24.)  By also alleging that Lackey and Saldarini failed to disclose that BHCM funds were being used to finance Kyck, and that the funds were necessary for BHCM's budget, Plaintiff set forth the general content of the withheld information, its materiality,

---

[5] North Carolina applies the same standard on a breach of fiduciary duty claim as applied above under Delaware law.  *See Global Promotions Group, Inc. v. Danas Inc.*, 2012 NCBC 38 ¶ 29 (N.C. Super. Ct. June 22, 2012), http://www.ncbusinesscourt.net/opinions/2012_NCBC_38.pdf.

and what Lackey and Saldarini gained by withholding it. (V. Compl. ¶¶ 122–24, 140.) As discussed above, the allegations also outline BHCM's reasonable and detrimental reliance upon Lackey and Saldarini's representations based upon their role in the company and their acts to conceal the true purpose of their expenditures from BHCM capital, and the resulting damage to BHCM. (V. Compl. ¶¶ 25, 34–35, 44, 53, 128, 132, 143–48.) The Court concludes that Plaintiff has adequately pled a claim for fraudulent concealment.

{82} Accordingly, the Court **DENIES** Defendants' Motion I as to Plaintiff's derivative claim for fraudulent concealment.

j.

CONVERSION

{83} Conversion is "'an unauthorized assumption and exercise of the right of ownership over [the personal property of] another, to . . . the exclusion of an owner's rights.'" *Straton v. Royal Bank of Canada*, 712 S.E.2d 221, 227 (N.C. Ct. App. 2011) (quoting *Peed v. Burleson's, Inc.*, 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956)). A plaintiff must plead two essential elements to establish conversion: (1) "ownership in the plaintiff" and (2) "a wrongful deprivation by defendant." *Gallimore v. Sink*, 27 N.C. App. 65, 67, 218 S.E.2d 181, 183 (1975) (citation omitted). The gravamen of the tort is the wrongful deprivation, not the procurement of property. *Id.* One in lawful possession of property may not be accused of depriving another of possession wrongfully, unless the owner makes a demand for the return of property and is refused by the possessor. *Hoch v. Young,* 63 N.C. App. 480, 483, 305 S.E.2d 201, 203 (1983). However, where an individual receives property from a third party who did not have lawful possession or authority to transfer the property,

> mere receipt of [possession] from a third person with an intent to acquire a proprietary interest therein [will constitute] a conversion without a demand for its return by the owner. The fact that the person in possession is without knowledge that the third person had no power to transfer a proprietary interest is immaterial.

*Id.* at 483, 305 S.E.2d at 203–04 (quoting ROBERT E. LEE, NORTH CAROLINA LAW OF PERSONAL PROPERTY 60 (1968)).

{84} Here, Plaintiff alleges that CBA acquired ownership of BHCM funds by way of the $400,000 transfer. (V. Compl. ¶¶ 24, 26.) And, by retaining $100,000 and transferring $300,000 to Kyck, Plaintiff claims that CBA deprived BHCM of its money. (V. Compl. ¶¶ 156, 160.) Because CBA received the money as a "distribution" in violation of BHCM's Operating Agreement, Plaintiff further alleges that this constituted an unauthorized assumption and exercise of the right of ownership over BHCM's funds. (V. Compl. ¶¶ 156, 160.)

{85} Defendants' argue that CBA received lawful possession of the money as a Preference, which could be made in compliance with the Operating Agreement, and that Plaintiff failed to allege demand and refusal. (Defs.' Br. Supp. Mot. Dismiss 15–16.) However, as discussed above, Plaintiff alleges that Defendants classified the transfer as a distribution at the time CBA took ownership, and Lackey and Saldarini did not follow proper procedures for making a distribution. (V. Compl. ¶¶ 24, 45, 51.) As such, Lackey and Saldarini did not have lawful possession of the funds or the authority to transfer the funds to CBA as a distribution. The fact that CBA may not have had knowledge that Lackey and Saldarini lacked the authority to make the transfer is immaterial. Their receipt of the money from an unauthorized transfer would constitute conversion without requiring BHCM to demand return of the money. Therefore, accepting the allegations of the Complaint as true, the Court concludes Plaintiff has alleged sufficient facts to state a claim for conversion against CBA.

{86} Accordingly, the Court **DENIES** Defendants' Motion I as to Plaintiff's derivative claim for conversion.

k.

UNJUST ENRICHMENT

{87} "In order to state a claim for unjust enrichment, the plaintiff's allegations must set forth that a benefit was conferred on the defendant, that the defendant accepted the benefit, and that the benefit was not gratuitous." *Jackson v. Carolina Hardwood Co.*, 120 N.C. App. 870, 872, 463 S.E.2d 571, 573 (1995) (citing *Boe v. Shadrick,* 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988)). Specifically, in a claim for

unjust enrichment based on money wrongfully or mistakenly paid to another, "[a]n action . . . is permitted 'on the theory that by such payment the recipient has been unjustly enriched at the expense of the party making the payment and is liable for money had and received.'" *Primerica Life Ins. Co. v. James Massengill & Sons Constr. Co.*, 712 S.E.2d 670, 676 (N.C. Ct. App. 2011). "Therefore, the crucial question in an action of this kind is, to which party does the money, in equity and good conscience, belong?" *Id.* (quotations omitted).

{88} Here, the parties do not dispute that a $400,000 benefit was conferred on CBA, nor do they dispute that CBA accepted the benefit. (V. Compl. ¶¶ 24, 26; Defs.' Br. Supp. Mot. Dismiss 18–19.) However, Defendants contend that CBA received the money as part of a Preference pay down, while Plaintiff alleges that Lackey and Saldarini wrongfully distributed the money to CBA in violation of BHCM's rights. (V. Compl. ¶¶ 169–71.) As discussed previously, at this stage of the case, the Court must accept as true Plaintiff's allegations that the parties treated the transfer as a distribution at the time it was made to CBA. (V. Compl. ¶¶ 24, 26.)

{89} Because Defendants classified the transfer as a distribution, Plaintiff further alleges that the transfer violated the terms of the Operating Agreement, resulting in equitable ownership of the funds remaining vested in BHCM. (V. Compl. ¶¶ 28–29.) Plaintiff alleges that CBA should be held liable to BHCM for the money had and received. Otherwise, CBA would be left unjustly enriched by the wrongful distribution. The Court concludes, therefore, that Plaintiff has properly alleged a claim for unjust enrichment against CBA on behalf of BHCM.

{90} Accordingly, the Court **DENIES** Defendants' Motion I as to Plaintiff's derivative claim for unjust enrichment.

C.

DEFENDANTS' MOTION II

1.

STANDARD OF REVIEW

{91}   As a fact-specific inquiry, the determination of whether to remove a representative plaintiff in a derivative action, pursuant to Court of Chancery Rule 23.1, lies within the trial court's discretion.  *See Larson v. Dumke*, 900 F.2d 1363, 1369 (9th Cir. 1990).[6]  Given the derivative plaintiff's fiduciary role as representative for the company, a ruling pursuant to "Rule 23.1 has been interpreted as requiring that a court consider any extrinsic factors which might indicate that a representative might disregard the interests of the other members of the class." *Emerald Partners v. Berlin*, 564 A.2d 670, 673 (Del. Ch. 1989).  And, although the Court can find no Delaware case law which specifically states that a court may look outside the pleadings on a motion to remove a derivative plaintiff pursuant to Rule 23.1, the Court of Chancery appears to imply this standard of review without directly addressing it.  *See id.* (denying a motion to disqualify derivative plaintiff after considering the depositions presented by the parties); *Youngman v. Tahmoush*, 457 A.2d 376, 378–81 (Del. Ch. 1983) (stating that the court must look to all the facts and circumstances in the case, including arguments put forward by the defendant and by way of depositions).  This principle finds further support in federal case law applying Rule 23 for class actions, which Delaware courts look to in interpreting Rule 23.1.[7]  *See Banyai v. Mazur*, 205 F.R.D. 160, 163 (S.D.N.Y. 2002) ("[A] district court must accept as true the substantive allegations in the complaint . . . and does not conduct even a preliminary inquiry

---

[6] Since Court of Chancery Rule 23.1 mirrors the corresponding federal rule, Delaware courts look to accompanying federal case law to interpret the adequacy of derivative representatives. *See Youngman v. Tahmoush*, 457 A.2d 376 (Del. Ch. 1983).

[7] Because the derivative plaintiff acts as a representative of a class in bringing its suit, courts look to cases interpreting Rule 23 for class action representatives to analyze the similar requirements under Rule 23.1 for derivative representatives. *See Youngman*, 457 A.2d 376, 379.  Indeed, in Delaware, courts have held that the adequacy requirement for derivative plaintiffs, *infra*, was implied in Rule 23.1 based on Rule 23 and accompanying federal case law.  *Id.*

into the merits of the case. . . . In addition, the court may look outside the pleadings for the proof necessary . . . .").

{92}   In adopting relevant federal case law to analyze Rule 23.1, Delaware courts have, by implication and application, settled the standard for assessing the adequacy of the representative plaintiff, prompting this Court to consider matters outside the pleadings. Accordingly, while accepting the allegations in the complaint as true, the Court will also look outside the pleadings to determine Plaintiff's fitness for the purposes he wishes to serve as derivative plaintiff.

2.

ADEQUACY OF THE DERIVATIVE PLAINTIFF

{93}   "[T]he only explicit standing requirement for maintaining a derivative suit is that the plaintiff be a stockholder of the corporation at the time of the transaction . . . ." *Youngman*, 457 A.2d at 379. However, courts recognize an additional implicit requirement that the plaintiff be an adequate representative for its class. *Id.* ("[P]laintiff . . . must be qualified to serve in a fiduciary capacity as a representative of a class, whose interest is dependent upon the representative's adequate and fair prosecution.").

{94}   The burden is on the defendant to "show that a serious conflict of interest exists, . . . [such that there is] a substantial likelihood that the derivative action is not being used as a device for the benefit of all the stockholders." *Id.* at 381. However, this conflict must be evident. "[P]urely hypothetical, potential or remote conflicts of interests never disable the individual plaintiff." *Id.* at 380. To determine if such a conflict exists, courts will look to a list of non-exclusive factors including the following:

    (1) economic antagonisms between representative and class;
    (2) the remedy sought by plaintiff in the derivative litigation;
    (3) indications that the named plaintiff was not the driving force behind the litigation;
    (4) plaintiff's unfamiliarity with the litigation;
    (5) other litigation pending between the plaintiff and defendants;
    (6) the relative magnitude of plaintiff's personal interests as compared to her interest in the derivative action itself;
    (7) plaintiff's vindictiveness toward defendants; and

(8) the degree of support plaintiff was receiving from the shareholders she purported to represent.

*Bakerman v. Sidney Frank Importing Co.*, 2006 Del. Ch. LEXIS 180, *34–*35 (Del. Ch. 2006); *see also Youngman*, 457 A.2d at 379–80. While none of these factors controls the analysis, the Court may dismiss a derivative representative upon "a strong showing of one factor which is actually inimical to the class." *Youngman*, 457 A.2d at 380.

{95} Defendants concede that the third and fourth factors above do not apply to this case, but assert that the remaining six require Plaintiff's disqualification given Plaintiff's personal interest in controlling BHCM, Plaintiff's direct claims asserted against Defendants, and the lack of support from the remaining members of BHCM.

{96} First, Defendants argue that Plaintiff's personal interest in gaining control of BHCM outweighs any interest he has in pursuing the derivative action. Specifically, Defendants point to Plaintiff's desire to take over as the sole manager of BHCM as expressed in Plaintiff's "Updated Proposed Solution" and his demand letter sent on September 11, 2011. (Defs.' Br. Supp. Mot. Remove Ex. A, Ex. C.) However, selfish motives alone will not mandate Plaintiff's disqualification as an inadequate representative. *Youngman*, 457 A.2d at 382. Indeed, it is hardly unusual for derivative plaintiffs to have their own interests in mind when bringing a derivative action. *See id.* Here, Plaintiff accuses the other two managers of acting against the interests of BHCM. (*See generally* V. Compl.) In Plaintiff's view, he represents the remaining manager acting on behalf of BHCM. Plaintiff's position does not directly conflict with the interests of BHCM or Plaintiff's ability to represent those interests. Based on the information presented, Defendants have failed to demonstrate that Plaintiff's desire to run the business himself conflicts with his ability to act as fiduciary for the class in the derivative action to an extent that would require his removal.

{97} Second, Defendants assert that Plaintiff's direct claims create economic antagonism between Plaintiff and the class, which also implicates other factors that support Plaintiff's removal or dismissal, including the presence of other litigation

and Plaintiff's vindictiveness towards Defendants.  Since Plaintiff seeks to recover money directly for himself, as well as derivatively for BHCM, Defendants contend that Plaintiff's "personal claims . . . draw from the same finite pool of potential recovery [as the derivative claims], creating a conflict . . . ."  (Defs.' Br. Supp. Mot. Remove 9–10.)  Although the Court dismissed Plaintiff's parallel direct claims above, Plaintiff's defamation claim remains.

{98}   "A plaintiff in a stockholder derivative suit will not be disqualified simply because he may have interests which go beyond the interests of the class . . . ." *Balin v. Amerimar Realty Co.*, 1996 Del. Ch. LEXIS 146, *11 (Del. Ch. 1996) (quoting *Emerald Partners*, 564 A.2d at 674).  While it is true that Defendants may be liable for the relief sought on the defamation and derivative claims if Plaintiff prevails, this does not create an inherent conflict such that Plaintiff could not adequately pursue the derivative action.  As stated by the court in *Balin*, "a finding for [Plaintiff] on his individual claims [would not] preclude a recovery by the corporation on the derivative claims.  Thus, there is no structural conflict . . . ." 1996 Del. Ch. LEXIS at *11.  Similarly, here, a recovery on Plaintiff's defamation claim in no way impacts the success or failure of the derivative claims or Plaintiff's ability to pursue both simultaneously.  Given that, the Court sees no clear conflict of interest based on Plaintiff's direct claim which would make Plaintiff an inadequate representative for BHCM's claims.

{99}   Considering the vindictiveness factor, absent some concrete fact revealing a conflict between Plaintiff and BHCM, "amorphous hostile feelings against defendants [are] not in [themselves] relevant." *Emerald Partners*, 564 A.2d at 677 (quoting *Vanderbilt v. Geo-Energy Ltd.*, 590 F. Supp. 999, 1001 (E.D. Pa. 1984)).  In fact, "this may inspire plaintiff to be an even more forceful advocate." *Id.* Therefore, even though Plaintiff's defamation claim may shed further light on the animosity between the parties, it fails to reveal any concrete conflict which would prevent Plaintiff from adequately representing BHCM.

{100} Finally, Defendants point to the lack of support from the other members of BHCM for Plaintiff's lawsuit.  (Hayes Aff. ¶ 9; Bauknight Aff. ¶ 4.)  "A derivative

claim may be maintained, however, without the support of a majority of ownership or even the support of the entire minority. Adequacy of representation is judged by how well a shareholder advances the interests of other similarly situated shareholders." *Bakerman*, 2006 Del. Ch. LEXIS at *43. Where only one person is disadvantaged such that there are no other similarly situated members, "one could not imagine a better representative than [that one member] to pursue the appropriate remedies on behalf of the LLC." *Id.*

{101} Plaintiff represents the only member not connected or involved with the transfer from BHCM to Kyck. Lackey and Saldarini allegedly orchestrated the transfer from BHCM to benefit their new venture, Kyck. (V. Compl. ¶¶ 24, 26, 31–33.) Furthermore, the transfer initially was made to CBA, an entity that allegedly operated as a shell company for the remaining members Cherokee, Bowin, and Hayes. (V. Compl. ¶¶ 24, 26.) Given that the remaining members allegedly knew about, and arguably benefited from, the challenged transfer, they cannot claim to be similarly situated with Plaintiff, and their lack of support for Plaintiff's lawsuit appears predetermined. The Court concludes, therefore, that Plaintiff's lack of support from the other members is not determinative of his adequacy as a representative plaintiff.

{102} The Court concludes, therefore, that Defendants have failed to demonstrate Plaintiff's inadequacy as derivative plaintiff. Accordingly, the Court **DENIES** Defendants' Motion II to remove Plaintiff as derivative representative.

D.

PLAINTIFF'S MOTION TO AMEND

{103} According to North Carolina Rules of Civil Procedure Rule 15(a), after a party files a responsive pleading, the "party may amend his pleading only by leave of court." N.C. R. Civ. P. 15(a). Upon a motion to amend, "leave shall be freely given [by the court] when justice so requires," N.C. R. Civ. P. 15(a), and a ruling on such motion "is addressed to the sound discretion of the trial court . . . ." *City of Winston-Salem v. Yarbrough*, 117 N.C. App. 340, 347, 451 S.E.2d 358, 364 (1994). Accordingly, "motions to amend the pleadings should be granted unless there is a

compelling reason not to do so." *Polo Ralph Lauren Corp. v. Gulf Ins. Co.*, 2001 NCBC 3 ¶ 7 (N.C. Super. Ct. Jan. 31, 2001), http://www.ncbusinesscourt.net/opinions/2001%20NCBC%203.htm (citing *Mauney v. Morris*, 316 N.C. 67, 340 S.E.2d 397 (1986)).  "Some reasons justifying denial of an amendment are (a) undue delay, (b) bad faith, (c) undue prejudice, (d) futility of amendment, and (e) repeated failure to cure defects by previous amendments." *Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 44 (2006) (citation omitted).

{104} Here, Defendants first argue that Plaintiff's motion to amend his complaint to add a party, to include new claims, and to clarify facts should be denied because of undue delay and prejudice.[8]  Specifically, Defendants assert that allowing the motion to amend while the motion to dismiss is pending will prejudice Defendants, given the potential for additional motions to dismiss and further briefing.  However, information learned during discovery may often lead to additional claims or parties which the plaintiff, in the interest of justice, should be allowed to include in its complaint. *Carolina Builders Corp. v. Gelder & Assocs.*, 56 N.C. App. 638, 641, 289 S.E.2d 628, 629 (1982).  In *Carolina Builders*, the court allowed the plaintiff to amend the complaint based on documents uncovered during discovery four months after defendants filed an answer and moved for summary judgment. *Id.*  Similarly, here, Plaintiff filed his motion to amend two months after Defendants filed their motion to dismiss and just one month after receiving the documents requested in discovery. (Pl.'s Reply Br. Supp. Mot. Am. Compl. 3.)  Given that, the Court concludes that Plaintiff did not unduly delay his request for an amendment to his complaint.  Furthermore, the Court can discern no prejudice to defendants by allowing Plaintiff's motion.

{105} Defendants then argue that allowing the amendment would be futile as it would fail to correct any defects and does not state a claim upon which relief may be

---

[8] Defendants also argue that the motion should be denied because the proposed Amended Complaint is not verified as required for derivative suits under North Carolina Rules of Civil Procedure Rule 23(b).  However, as correctly pointed out by Plaintiff, the Amended Complaint attached to the motion is merely proposed at this point and will only be filed upon the Court granting leave to amend, at which point the Amended Complaint would have to comply with Rule 23(b).  Therefore, the Court need not address this argument for its ruling on Plaintiff's Motion to Amend.

granted. Again, in *Carolina Builders*, the court commented that "even though upon remand the trial court may determine that plaintiff cannot recover on the claim asserted in the amended complaint," it could not conclude that allowing the amendment would be futile. 56 N.C. App. at 641, 289 S.E.2d at 629. Here, while Defendants may have persuasive arguments to defeat the new claims at a later stage, at this point, the Court cannot conclude that any deficiency in the amended portions of the complaint warrants denying this motion because of its futility.

{106} Therefore, in the spirit of liberality espoused under Rule 15(a), the Court concludes that no compelling reason exists to deny Plaintiff's Motion to Amend. Accordingly, the Court **GRANTS** Plaintiff's Motion to Amend the Complaint.

IV.

CONCLUSION

{107} The Court **GRANTS** in part and **DENIES** in part Defendants' Motion to Dismiss pursuant to Rule 12(b)(6); **DENIES** Defendants' Motion to Remove Jack Scott as Derivative Representative; and **GRANTS** Plaintiff's Motion for Leave to Amend his Complaint.

{108} **WHEREFORE**, the Court hereby **DISMISSES** Plaintiff's direct claims for breach of the Operating Agreement, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, fraudulent concealment, fraud, constructive fraud, conversion, and unjust enrichment.

**SO ORDERED**, this the 3rd day of December, 2012.